UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY,

      Plaintiff,

      v.

INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA., et al.,

      Defendants.

---

INSURANCE COMPANY OF THE STATE
OF PENNSYLVANIA,

      Counterclaimant,

      v.

ST. PAUL FIRE AND MARINE
INSURANCE COMPANY, et al.,

      Counterdefendants.

Case No. 15-CV-02744-LHK

**ORDER RE: MOTIONS FOR
SUMMARY JUDGMENT**

Re: Dkt. Nos. 131, 132, 135, 140-3

After a construction defect lawsuit involving Counterdefendant Brady Company/Central California, Inc. ("Brady") settled, Brady's insurers agreed to pay certain amounts in the settlement. Before the Court are four motions for summary judgment on claims and counterclaims brought by the insurance companies who covered Brady under commercial general liability policies in the relevant time period. Specifically, this Order addresses the following four motions

1

United States District Court
Northern District of California

1  for summary judgment: Defendant-Counterclaimant Insurance Company of the State of

2  Pennsylvania's ("Penn's") Motion for Summary Judgment , ECF No. 140-3 ("Penn Mot."); St.

3  Paul Fire and Marine Insurance Company's ("St. Paul's") Motion for Summary Judgment, ECF

4  No. 132 ("St. Paul Mot."); Travelers Property Casualty Company's ("Travelers'") Motion for

5  Summary Judgment, ECF No. 131 ("Travelers Mot."); and Zurich American Insurance

6  Company's ("Zurich's") Motion for Summary Judgment, ECF No. 135 ("Zurich Mot.").

7       Having considered the parties' briefing, the relevant law, and the record in this case, the

8  Court GRANTS in part and DENIES in part Penn's Motion, GRANTS in part and DENIES in part

9  Travelers' Motion, GRANTS in part and DENIES in part Zurich's Motion, and GRANTS St.

10  Paul's Motion.

11  **I.  BACKGROUND**

12      **A.  Factual Background**

13       This case is a dispute regarding the amount of money each of Brady's insurers must pay

14  towards a settlement that Brady reached to resolve claims involving Brady's negligent

15  construction work as a subcontractor.  The Court first discusses that construction project, then the

16  Court discusses the underlying lawsuit and its settlement.  Finally, the Court turns to the

17  allegations in this case.

18      **1.  Brady's Work as Subcontractor**

19       In 2002, the Regents of the University of California (the "Regents") hired Devcon

20  Construction, Inc. ("Devcon") to build 17 student housing dormitories on the University of

21  California Santa Cruz campus (the "Housing Project").  ECF No. 131-1 at 7, Travelers Mot. Ex. A

22  ("Regents-Devcon Contract").  To complete the Housing Project, Devcon hired a number of

23  subcontractors, including Brady.  For about $4 million Devcon hired Brady to "[f]urnish all labor,

24  equipment and materials for Metal Lath, Plaster, Gyp Board, and Fireproofing work in accordance

25  with the Contract Document."  ECF No. 131-1 at 81–82, Travelers Mot. Ex. B ("Brady-Devcon

26  Subcontract").

27       Specifically, the Brady-Devcon Subcontract provided that, on the interior of the buildings,

28  

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1   Brady would furnish and install "Gyp Board," otherwise known as drywall, to form the interior

2   walls.  ECF No. 131-4, Ex. DD, Expert Report of Amy Collins Cassidy ("Cassidy Rep.") at 3.  As

3   part of the interior wall installation, Brady was to "[f]urnish and install green board at all tub and

4   shower areas and public restrooms."  Brady-Devcon Subcontract at 97.  "[T]he main purpose of

5   the green board was to provide a solid, moisture and mold-resistant material as backing for the

6   acrylic panels that covered the shower and tub walls."  Cassidy Rep. at 42.

7           On the exterior of the buildings, the Brady-Devcon Subcontract provided that Brady would

8   use "Metal Lath" (a metal mesh) and cement "Plaster", to create a stucco exterior for the buildings

9   in the Housing Project.  Brady-Devcon Subcontract at 96.  Exterior stucco "protect[s] the building

10  from the weather, as well as provide[s] resistance against water intrusion."  Cassidy Rep. at 42.

11          In their respective contracts, Devcon agreed to indemnify Regents for all losses related to

12  Devcon's failure to perform.  Regents-Devcon Contract at 26.  Similarly, Brady agreed to

13  indemnify Devcon for failure to perform and for attorney's fees and costs in litigation arising out

14  of the Housing Project.  Brady-Devcon Contract at 84.  The Housing Project was completed on

15  October 1, 2004.  ECF No. 131-2, Travelers Mot. Ex. I, at 154.

16                  **2.          Damage to the Housing Project and the Underlying Lawsuit**

17          Starting in late 2004 or early 2005, defects in the installation of the showers and tubs began

18  to cause water damage.  ECF No. 140-5 at 128, Penn Mot. Ex. 6, Declaration of Thomas Butt

19  ("Butt Decl.") ¶ 10 (noting that defects began to manifest within 6 months of October 2004).  The

20  Regents hired contractors to investigate these defects in 2011, and the investigation revealed

21  multiple internal defects in the showers and tubs.  ECF No. 140-10 at 28, Penn Mot. Ex. 7 ("Initial

22  Defect Report").

23          On March 14, 2012, the Regents sent Devcon a "Notice of Latent Defects" in the Housing

24  Project, which requested that Devcon remedy the problems in the showers and tubs.  ECF No.140-

25  10 at 35, Penn Mot. Ex. 8 ("Regent Notice").  On March 26, 2012, Devcon informed Brady of

26  these interior defects, and on March 30, 2012, Brady tendered its defense to Travelers and St.

27  Paul.  ECF No. 140-10 at 26, Penn Mot. Ex. 7 ("Brady Tender").

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

On June 27, 2012, the Regents sued Devcon "for the repair and replacement of the defectively constructed and installed shower enclosures and shower pans." *See* ECF No. 131-1, Travelers Mot. Ex. C, Complaint of the Regents against Devcon ("Regent Compl.") at 138.  The Regents' complaint included claims for breach of contract, breach of express warranty, negligence, and express indemnity, and also requested attorney's fees. *Id.* at 139–43.

On July 27, 2012, one month later, Devcon filed a cross-complaint against Brady and other subcontractors for breach of contract, negligence, strict products liability, and both equitable and contractual indemnification.  ECF No. 140-5 at 188, Penn Mot. Ex. 19, Devcon Cross Complaint against Brady ("Devcon Cross-Compl.").

Before the lawsuits were filed, the Regents informed Devcon that "we are continuing [our] investigation . . . in regards to other potential defective work including but not limited to: windows, entry doors, deck transitions, [and] cement plaster assemblies . . . ."  ECF No. 140-10 at 48, Penn Mot. Ex. 12 ("Regents March 23, 2012 Letter").  In mid-September, Brady's expert, who was doing a site visit to inspect the interior bathrooms in relation to the interior defects, noticed that testing was being performed on the exterior stucco, and also noticed that the stucco was cracking.  ECF No. 140-10 at 50–51, Penn Mot. Ex. 13.  Testing that took place between December 17 and December 20, 2012 indicated that water intrusion and water damage had occurred.  ECF No. 140-10, Penn Mot. Ex. 3.

On March 19, 2013, the Regents amended their complaint against Devcon to include damages related to the exterior of the Housing Project buildings.  ECF No. 140-5 at 168, Penn Mot. Ex. 18 ("Regents Amen. Compl.") ¶ 10 ("In or about December 2012, the University discovered numerous defective construction conditions . . . [including] "exterior cladding, windows, doors, and related areas.").

### 3.    Brady's Insurers

Brady had several different liability insurers in the time between the completion of the Housing Project, October 1, 2014, and the July 1, 2015 settlement agreement.  Those insurers include Penn, St. Paul, Travelers, Zurich, Counterdefendant American Guarantee and Liability

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

Insurance Company ("American Guarantee"), and Everest National Insurance Company ("Everest").  The parties agree that the coverage amount and relationship and amount for each relevant year is as follows:

| Coverage Period | Primary Liability Insurer | Excess Liability Insurer |
|---|---|---|
| 6/1/2004–6/1/2005 | St. Paul<br>$1M per occurrence/<br>$2M aggregate | Penn<br>$10M per occurrence/<br>$10M aggregate |
| 6/1/2005–6/1/2006 | Travelers<br>$1M per occurrence/<br>$2M aggregate | Penn<br>$10M per occurrence/<br>$10M aggregate |
| 6/1/2006–6/1/2007 | Zurich<br>$1M per occurrence/<br>$2M aggregate | Everest<br>$10M per occurrence/<br>$10M aggregate |
| 6/1/2007–6/1/2008 | Zurich<br>$1M per occurrence/<br>$2M aggregate | Everest<br>$10M per occurrence/<br>$10M aggregate |
| 6/1/2008–6/1/2009 | Zurich<br>$1M per occurrence/<br>$2M aggregate | American Guarantee<br>$10M per occurrence/<br>$10M aggregate |
| 6/1/2009–6/1/2010 | Zurich<br>$1M per occurrence/<br>$2M aggregate | American Guarantee<br>$25M per occurrence/<br>$25M aggregate |
| 6/1/2010–6/1/2011 | Zurich<br>$1M per occurrence/<br>$2M aggregate | American Guarantee<br>$25M per occurrence/<br>$25M aggregate |
| 6/1/2011–6/1/2012 | Zurich<br>$1M per occurrence/<br>$2M aggregate | American Guarantee<br>$25M per occurrence/<br>$25M aggregate |
| 6/1/2012–6/1/2013 | Zurich<br>$2M per occurrence/<br>$4M aggregate | American Guarantee<br>$25M per occurrence/<br>$25M aggregate |
| 6/1/2013–6/1/2014 | Zurich<br>$2M per occurrence/<br>$4M aggregate | American Guarantee<br>$1M per occurrence/<br>$2M aggregate |

*See* ECF No. 131-3 at 145–46, Travelers Mot. Ex. X.[1]

From June 2004 until June 2012, all of Brady's primary liability policies had policy limits

---

[1] For each of the above "coverage periods" the relevant liability insurer issued a separate policy.  Thus, the 2005-2006 Zurich Policy is a different policy from the 2006-2007 Zurich policy.  The Court delineates between "primary" and "excess" insurers because, usually, excess insurers only provide payment after the limits on the primary insurance have been exhausted.

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

of $1 million per occurrence and $2 million in the aggregate for multiple occurrences.  However, the 2012-2013 Zurich policy and the 2013-2014 Zurich policy had policy limits of $2 million per occurrence and $4 million in the aggregate for multiple occurrences.

Similarly, from June 2004 to June 2009, Brady's excess liability policies had policy limits of $10 million per occurrence and $10 million in aggregate.  Brady's American Guarantee policies from June 2009 onward had policy limits of $25 million per occurrence and $25 million in aggregate.

Each of these policies potentially had to pay for Brady's negligent actions under California's "continuing injury" doctrine.  "Where . . . successive [commercial general liability] policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating through several policy periods is potentially covered by *all* policies in effect during those periods."  *Montrose Chem. Corp. v. Admiral Ins. Co.*, 10 Cal. 4th 645, 689 (1995) (as modified) ("*Montrose II*").

### 4.    Settlement of the Underlying Suit

On May 11, 2015, the Regents settled with Devcon for $32 million.  Four million dollars of that amount was allocated to Brady's fault, and $3.8 million was allocated to attorney's fees. ECF No. 131-3 at 99, Travelers Mot. Ex. T ("Regents Settlement").  On July 1, 2015, Devcon and Brady agreed to settle Devcon's counterclaims against Brady for $4 million.  ECF No. 131-3 at 107, Travelers Mot. Ex. U ("Brady Settlement").

Travelers, Zurich, Penn, and Everest each allegedly agreed to pay $1 million towards the settlement. ECF No. 131-3 at 163, Travelers Mot. Ex. Z.  As noted above, Travelers' and Zurich's policies were "primary" policies, while Penn's and Everest's policies were "excess" policies. Generally, primary policies make payment first and exhaust their policy limits before excess policies are required to pay.  *AMHS Ins. Co. v. Mut. Ins. Co. of Ariz.*, 258 F.3d 1090, 1095 (9th Cir. 2001) ("[Excess] policies should not be asked to contribute until all primary policies have been exhausted.").

Travelers made payment under its 2005-2006 policy, and Zurich made payment under its

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

2006-2007 policy.  Both insurers asserted that they could not pay more than $1 million because their policies each had $1 million per occurrence policy limits.  Although Zurich's 2012-2013 Zurich policy had a $2 million limit, Zurich asserted that this case implicated only its earlier policies, which had a $1 million policy limit.  Furthermore, although Zurich and Travelers each had $2 million aggregate limits on their policies, they each asserted that their payments were limited to $1 million because only one occurrence was at issue.  Also, although the Zurich and Travelers policies contained a "supplementary payment" provision, which requires payment of attorney's fees, Zurich and Travelers asserted that they did not need to make such payments because the settlement did not allocate attorney's fees.

Penn made its $1 million payment subject to a reservation of the right to seek reimbursement from Brady's other insurers.  Indeed, on May 15, 2015, Penn demanded that Travelers, Zurich, or St. Paul pay $302,178.75 under "supplementary payment" provisions in their insurance policies to cover the attorney's fees Penn contends were part of the $4 million settlement.  ECF No. 131-3 at 93–94, Travelers Mot. Ex. R.

**B.      Procedural History**

**1.      Initial Pleadings**

On June 18, 2015, St. Paul filed the instant suit against Penn and ten unnamed defendants.  ECF No. 1 ("Compl.").  St. Paul seeks a declaratory judgment stating that St. Paul does not owe any money for the settlement over the $1 million it agreed to pay.  *Id.* ¶ 23.  Penn answered the complaint on August 12, 2015.  ECF No.7.

On October 2, 2015, Penn filed counterclaims against St. Paul, Travelers, and Zurich.  ECF No. 22 ("Counter-Compl.").  Specifically, Penn's counterclaims include six causes of action.  In the first cause of action in its counterclaims, Penn seeks a declaration that St. Paul, Travelers, and Zurich are obligated to contribute additional sums to Brady's portion of the global settlement because the underlying construction defect litigation was the result of multiple covered events.  In the second cause of action in Penn's counterclaims, Penn additionally seeks a declaration that St. Paul, Travelers, and Zurich must make the additional "Supplementary Payments" at issue in the

7

1      St. Paul complaint.  The third and fourth causes of action in Penn's counterclaims are equitable

2      subrogation claims seeking reimbursement from St. Paul, Travelers, and Zurich for the same

3      payments at issue in the first and second causes of action, respectively.  *Id.*  The fifth and sixth

4      causes of action are claims seeking the same reimbursement from St. Paul, Travelers, and Zurich

5      as the third and fourth causes of action under a theory of unjust enrichment.  *Id.*

6              St. Paul and Travelers filed an answer to Penn's counterclaims on October 23, 2015.  ECF

7      No. 30.  St. Paul and Travelers filed a First Amended Complaint ("FAC") on November 4, 2015.

8      ECF No. 35 (FAC); ECF No. 38 (Errata to FAC).  Penn filed an answer to the FAC on November

9      24, 2015.  ECF No. 40.

10             Zurich filed a motion to dismiss claims five and six of Penn's counterclaims on December

11     7, 2015 asserting that an excess insurer cannot bring a claim for unjust enrichment against a

12     primary insurer under California law.  ECF No. 41.  Penn filed a response on December 21, 2015,

13     ECF No. 53, and Zurich filed a reply on December 28, 2015, ECF No. 56.

14             St. Paul and Travelers filed a motion to dismiss Penn's counterclaims on December 7,

15     2015 asserting that Brady was a necessary party to the instant suit.  ECF No. 44.  Penn filed a

16     response on December 21, 2015, ECF No. 54, and St. Paul and Travelers filed a reply on

17     December 28, 2015, ECF No. 57.

18             On March 28, 2016, this Court denied Zurich's motion to dismiss and held that an excess

19     insurer can bring a claim for unjust enrichment against a primary insurer under California law.

20     ECF No. 68.  In the same Order, the Court granted St. Paul's and Traveler's motion to dismiss

21     requiring Penn to add Brady as a counterdefendant.  *Id.*

22                         **2.      Operative Pleadings**

23             On May 12, 2016, Penn filed First Amended Counterclaims ("FA Counterclaims") against

24     St. Paul, Travelers, Zurich, American Guarantee, and Brady.  ECF No. 73 (FA Counterclaims).  In

25     the first cause of action as in the original counterclaims, Penn seeks a declaration that St. Paul,

26     Travelers, and Zurich are obligated to contribute additional sums to Brady's settlement because

27     the underlying construction defect litigation was the result of multiple covered events.

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

Additionally, Penn seeks a declaration that Zurich needs to pay additional amounts because the damage at issue continued through the 2012-2013 Zurich policy, which had a higher $2 million limit.  Finally, Penn seeks a declaration that American Guarantee, the policy excess to Zurich, needs to contribute to the settlement.  In the second cause of action, as with the original counterclaims, Penn seeks a declaration that St. Paul, Travelers, and Zurich must make the additional "Supplementary Payments" at issue in the St. Paul complaint.

The third and fourth causes of action in Penn's counterclaims are equitable subrogation claims seeking reimbursement from St. Paul, Travelers, Zurich, and American Guarantee for the same payments at issue in the first and second causes of action, respectively.  *Id.*  The fifth and sixth causes of action are claims seeking the same reimbursement from St. Paul, Travelers, Zurich, and American Guarantee as the third and fourth causes of action under a theory of unjust enrichment.  *Id.*

On June 3, 2016, St. Paul and Travelers answered Penn's amended counterclaims and brought cross-claims against Zurich.  ECF No. 87.  St. Paul's and Travelers' first cross-claim seeks a declaration of St. Paul's, Travelers', and Zurich's responsibilities for contribution if Penn is successful in its amended counterclaims against Travelers.  St. Paul's and Travelers' second cross-claim seeks equitable contribution from Zurich if Travelers' or St. Paul is found liable on Penn's amended counterclaims.  *Id.*  On June 27, 2016, Zurich answered St. Paul's and Traveler's cross-claims.  ECF No. 99.

On June 10, 2016, Zurich answered Penn's amended counterclaims.  ECF No. 89.  On the same day, June 10, 2016, American Guarantee answered Penn's amended counterclaims.  ECF No. 90.  On June 20, 2016, Brady answered Penn's amended counterclaims.  ECF No. 96.

On June 10, 2016, Zurich filed counterclaims against Penn and cross-claims against St. Paul, Travelers, and Brady.  ECF No. 91.  Zurich asserted the following five causes of action as the basis for its counterclaims and cross-claims: (1) declaratory relief that the 2012-2013 and 2013-2014 $2 million limit policies are not applicable under an exclusion that excludes coverage if an insured knows about the damage before the policy period, (2) declaratory relief that the 2012-

9

United States District Court
Northern District of California

1   2013 and 2013-2014 policies do not cover Brady because he has not paid the required $100,000

2   self insured retention, (3) declaratory relief that, although Zurich issued multiple policies in the

3   time period relevant to Brady's liability, Brady can only recover from one of the policies, (4)

4   declaratory relief that the underlying action involved a single occurrence, thus only implicating

5   single occurrence limits in the Zurich policy, and (5) declaratory relief that, even if Brady's failure

6   to pay the self insured retention does not preclude coverage under the 2012-2013 and 2013-2014

7   Zurich policies, Brady must pay the relevant self insured retention.  *Id.*  Against Brady only,

8   Zurich brings a sixth cause of action asserting that, if Zurich's 2012-2013 or 2013-2014 policies

9   apply, Brady must pay the self insured retention for those policies.  *Id.*

10          On June 23, 2016, Penn answered Zurich's counterclaims.  ECF No. 98.  On July 21, 2016,

11   St. Paul and Travelers answered Zurich's cross-claims.  ECF No. 105.  On August 19, 2016,

12   Brady answered Zurich's cross-claims.  ECF No. 108.

13          On August 19, 2016, Brady filed counterclaims against Penn and cross-claims against St.

14   Paul, Travelers, American Guarantee, and 15 John Does.  ECF No. 109.  In the first cause of

15   action of Brady's counterclaims and cross-claims, Brady seeks a declaration that the insurers in

16   this case owe Brady a duty to defend in this action and that Brady does not owe any additional

17   amounts to any insurers.  *Id.*  In the second cause of action of Brady's counterclaims and cross-

18   claims, Brady seeks reimbursement for defense costs in this action or for any other payments

19   Brady is found to owe.  *Id.*

20          On September 8, 2016, Penn filed an answer to Brady's counterclaims.  ECF No. 111.  On

21   September 30, 2016, Zurich answered Brady's cross-claims.  ECF No. 113.  On September 30,

22   2016, American Guarantee answered Brady's cross-claims.  ECF No. 114.  On November 14,

23   2016, St. Paul and Travelers answered Brady's cross-claims.  ECF No. 127.

24                      **3.      The Instant Motions**

25          On January 4, 2017, Penn filed one of the instant motions for summary judgment.  ECF

26   No. 140-3 ("Penn Mot.").  On January 18, 2017, Brady filed an opposition, ECF No. 152

27   ("Brady's Penn Opp'n"); St. Paul and Travelers filed a joint opposition, ECF No. 156 ("Travelers'

28
                                                10

United States District Court
Northern District of California

1    Penn. Opp'n"); Zurich filed an opposition, ECF No. 158 ("Zurich's Penn Opp'n"); and American

2    Guarantee filed an opposition, ECF No. 148 ("American Guarantee's Penn Opp'n"), to Penn's

3    Motion.  On January 25, 2017, Penn filed a reply to Brady's opposition, ECF No. 177-5 ("Penn's

4    Brady Reply"), a reply to St. Paul's and Travelers' opposition, ECF No. 178 ("Penn's Travelers

5    Opp'n"), a reply to Zurich's opposition, ECF No. 177-6 ("Penn's Zurich Opp'n"), and a reply to

6    American Guarantee's opposition, ECF No. 179 ("Penn's American Guarantee Opp'n").

7            On January 4, 2017, Travelers and Zurich filed motions for summary judgment against

8    Penn.  ECF No. 131 ("Travelers Mot"); ECF No. 135 ("Zurich Mot.").  On January 18, 2017,

9    Brady filed notices of non-opposition to both motions.  ECF Nos. 153, 154.  Also on January 18,

10   2017, Penn filed a combined opposition to Travelers' and Zurich's motions.  ECF No. 154

11   ("Penn's Travelers/Zurich Opp'n").  On January 25, 2017, Travelers and Zurich each filed a reply.

12   ECF No. 176 ("Travelers Reply"); ECF No. 181 ("Zurich Reply").

13           On January 4, 2017, St. Paul filed a Motion for Summary Judgment.  ECF No. 132 ("St.

14   Paul Mot.").  On January 18, 2017, Brady filed a notice of non-opposition to St. Paul's Motion,

15   ECF No. 153, and Penn filed an opposition to St. Paul's Motion, ECF No. 163-5 ("Penn's St. Paul

16   Opp'n").  On January 25, 2017, St. Paul filed a reply.  ECF No. 175 ("St. Paul Reply").

## II.    LEGAL STANDARD

### A.    Summary Judgment

19           Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

20   that there is "no genuine issue as to any material fact and that the moving party is entitled to

21   judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those which may affect the

22   outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a

23   material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for

24   the nonmoving party.  *Id.*

25           The party moving for summary judgment bears the initial burden of identifying those

26   portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine

27   issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Where the moving

United States District Court
Northern District of California

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  However, on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The court is only concerned with disputes over material facts, and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.  It is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Id.*  If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party: if evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact.  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999).

**B.      State Law in Diversity Cases**

"In determining the law of the state for purposes of diversity, a federal court is bound by the decisions of the highest state court."  *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011).  If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict "how the state high court would resolve it."  *Id.*; *AirSea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 186 (9th Cir. 1989) (internal quotation marks omitted).  In the absence of clear authority, the Court looks for guidance from decisions of the state appellate courts and other persuasive authorities, such as decisions from courts in other

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

jurisdictions and treatises. *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 865 (9th Cir. 1996). "In assessing how a state's highest court would resolve a state law question[,] . . . federal courts look to existing state law without predicting potential changes in that law." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 939 (9th Cir. 2001).

## III.   DISCUSSION

Although the procedural history in the instant case is complex, the basic dispute is whether Penn should be reimbursed for the $1 million it paid for Brady's settlement. Penn may only be reimbursed if at least one of the other party insurance companies—Zurich, Travelers, St. Paul, or American Guarantee—owe more than they paid. Zurich and Travelers each paid $1 million and St. Paul and American Guarantee each paid nothing.

As noted above, there are four cross-motions for summary judgment in this case. Penn moves for summary judgment against Zurich, American Guarantee, and Brady. Penn Mot. at 4. Travelers, Zurich, and St. Paul each move for summary judgment against Penn. The Court addresses each motion in turn.

### A.   Penn's Motion

Penn's Motion addresses three relevant pleadings: Penn's counterclaims, Zurich's cross-claims, and Brady's cross-claims. Penn's first counterclaim for declaratory judgment, third counterclaim for equitable subrogation, and fifth counterclaim for unjust enrichment (collectively, the "Reimbursement Counterclaims") allege that Zurich, Travelers, St. Paul, and American Guarantee must reimburse Penn for the amount Penn paid into the Devcon settlement because Brady's insurance policies with Zurich, Travelers, St. Paul, and American Guarantee required them to pay more for the damages caused by Brady. Zurich brings five cross-claims against Penn that assert various legal theories why Zurich is not liable for additional payments. Brady also brings two cross-claims against Penn and the other insurance company parties that assert that Brady is owed a defense and reimbursement for any money Brady might be forced to pay as a result of the instant suit.

Penn's Motion seeks summary judgment against Zurich on Penn's Reimbursement

Counterclaims and Zurich's cross-claims, seeks summary judgment against American Guarantee on Penn's Reimbursement Counterclaims, and seeks summary judgment against Brady on Brady's counterclaims.  The Court addresses each of these aspects of the motion in turn.

### 1.     Penn's Arguments as to Zurich

In Penn's Motion, Penn argues that Zurich should reimburse Penn $1 million because Zurich wrongly paid into the settlement under the 2006-2007 Zurich policy, which has a $1 million policy limit, rather than the 2012-2013 Zurich policy, which has a $2 million policy limit.

In response, Zurich argues that the 2012-2013 Zurich policy, and its higher policy limits, do not apply because the 2012-2013 Zurich policy contains a "known loss provision."  Known loss provisions exclude coverage where the insured was aware of property damage before the insurance policy went into effect.  Zurich also argues that the 2012-2013 Zurich policy cannot apply because (1) Brady never paid a self insured retention on the 2012-2013 Zurich policy, which Zurich argues is a condition precedent for coverage under that policy; (2) that Brady cannot change policies from the policy he originally selected to provide coverage in the underlying action; and (3) Penn would have needed to pay the same amount regardless because it is not excess to the 2012-2013 Zurich policy.

Below, the Court finds a triable dispute of material fact as to whether the "known loss" provision excludes coverage under the 2012-2013 Zurich policy, and thus the Court need not reach Zurich's other arguments.  However, the same arguments Zurich raises in its opposition to Penn's Motion are brought affirmatively as part of Zurich's Motion.  Thus, the Court defers addressing those arguments in Penn's Motion until the discussion below of Zurich's Motion.

To address the question of whether the 2012-2013 Zurich policy applies, the Court first discusses why, absent the known loss provision, the 2012-2013 Zurich policy would increase Zurich's payment, and then turns to Penn's and Zurich's dispute concerning the known loss provision.

### a.     Why the 2012-2013 Zurich Policy Would Increase Zurich's Payments Into the Settlement

Under California's continuing injury doctrine, "property damage which is continuous or

14

progressively deteriorating through several policy periods is potentially covered by *all* policies in effect during those periods." *Montrose II*, 10 Cal. 4th at 689.  As a result, where an insurer has issued multiple policies over a time period in which a covered continuing injury has occurred, the policies "stack," that is, the insurer is liable up to the aggregate of the policy limits of each of the policies in effect during the continuing injury.  *Id.*; *see also State v. Cont'l Ins. Co.*, 55 Cal. 4th 186, 200 (2012) (as modified) (a continuous injury "effectively stacks the insurance coverage from different policy periods to form one giant 'uber-policy' with a coverage limit equal to the sum of all purchased insurance policies").  However, "an insurer may avoid stacking by specifically including an 'antistacking' provision in its policy."  *Continental Insurance*, 55 Cal. 4th at 202. Such a provision limits liability to the policy limits of one of the policies in place during the continuing injury.  *Id.*

Here, Zurich issued annual policies to Brady from 2006 to 2014, and the parties do not dispute that Brady's actions caused "continuous or progressively deteriorating" property damage during the entirety of the 2006-2014 time frame.  Penn Mot. at 14–15.  However, no "uber-policy" is created from the aggregate policy limits here because the Zurich policies contain an antistacking provision.  The antistacking provision states that when multiple Zurich policies apply to the same occurrence, "the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy and only that limit shall apply to that occurrence."  ECF No. 140-6 at 545, 2012-2013 Zurich Policy.

The Zurich policies with the highest policy limits in this case are the 2012-2013 and 2013-2014 Zurich policies, which have $2 million policy limits.  Each of the policies in place from 2006 to mid-2012 had lower, $1 million policy limits.  Thus, if no other policy language further limited the applicable policies, the 2012-2013 Zurich policy or the 2013-2014 Zurich policy would increase the aggregate limit for all of the policies from 2006 to 2014 to $2 million.

### b.    The Known Loss Provision

Although the 2012-2013 and the 2013-2014 Zurich policies and their higher $2 million policy limits would normally increase the aggregate policy limit, the 2012-2013 and 2013-2014

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

Zurich policies also contain a "known loss" provision.  The known loss provision in the 2012-2013 Zurich policy is as follows:

> b. This insurance applies to "bodily injury" and "property damage" only if:
> . . . .
> (3) Prior to the policy period, <u>no insured</u> listed under Paragraph 1. of Section II-Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, <u>knew that the "bodily injury" or "property damage" had occurred, in whole or in part.</u> If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.
> . . . .
> d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
> (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;
> (2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or
> (3) <u>Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.</u>

ECF No. 140-6 at 524, 2012-2013 Zurich Policy (emphases added).[2]

The parties agree that the above provision would preclude coverage under the 2012-2013 Zurich policy if Brady either (1) had knowledge of property damage before that policy went into effect on June 1, 2012, or (2) had knowledge of property damage that is a "continuation, change or resumption" of the earlier property damage.  For property damage to be a "continuation, change or resumption" of earlier property damage, courts have held that the earlier and later property damage must "share the same cause."  *Westfield Ins. Co. v. Wensmann, Inc.*, 840 N.W.2d 438, 453 (Minn. Ct. App. 2013); *see also Alkemade v. Quanta Indem. Co.*, 28 F. Supp. 3d 1125, 1131 (D. Or. 2014) ("[D]amage of the same type, from the same cause."); *see also Jardine v. Maryland*

---

[2] The 2013-2014 Zurich policy contains a substantially similar known loss provision.  Penn concedes that Brady had knowledge of all relevant damage before the 2013-2014 Zurich policy went into effect.  Thus, coverage is excluded under the 2013-2014 Zurich policy's known loss provision.

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

*Cas. Co.*, 2011 WL 6778798, at *11 (N.D. Cal. Dec. 27, 2011), *aff'd*, 532 F. App'x 662 (9th Cir. 2013) (holding that damage caused to the front section of the south wall was a continuation of the damage that occurred in the rear section of the south wall because the same defective plaster treatment caused the damage to both wall sections).

Here, Brady was held liable for having caused two types of property damage: (1) interior damage to the bathrooms through improper installation of green board and (2) exterior damage through improper installation of stucco.  Penn concedes that Brady had sufficient knowledge of the interior damage before June 1, 2012 to prevent the 2012-2013 Zurich policy from covering that damage.  However, Penn argues that Brady did not have any knowledge of the exterior damage until after June 1, 2012.

Zurich opposes Penn's motion by asserting that Brady had knowledge of the exterior damage on three different bases.  First, Zurich argues that stucco cracking that occurred before the project was completed in 2004 constitutes knowledge of the exterior property damage.  Second, Zurich argues that the interior property damage was sufficient to trigger the known loss provision for the exterior property damage.  Finally, Zurich argues that Brady was aware of property damage as result of a letter informing Brady that the Regents were investigating "potential defective work" on the stucco.  Because the Court finds below a triable issue of material fact on the third basis, the Court need not address the other two.

Zurich argues that Brady's knowledge of the Regents' investigation of "potential defective work" constituted knowledge of property damage before June 1, 2012.  Before addressing the evidence produced by Zurich and Penn, the Court notes two relevant points of law.  First, commercial general liability policies, like those at issue here, exclude all coverage for damage to the insured's work and to the materials the insured supplies as part of that work.  *See, e.g.*, ECF No. 140-6 at 539, 2012-2013 Zurich Policy (excluding coverage for "your work," which is defined as "[w]ork or operations performed by you or on your behalf; and [m]aterials. parts or equipment furnished in connection with such work or operations.").  Second, as result of an insured's work not being covered under commercial general liability policies, knowledge of defects in an

17

United States District Court
Northern District of California

insured's work is not equivalent to knowledge of property damage caused by that work.  *Kaady v. Mid-Continent Cas. Co.*, 790 F.3d 995, 997 (9th Cir. 2015) (holding that knowledge of crack in stone installed by mason not equivalent to knowledge of damage to property underneath the stone); *Ameron Int'l Corp. v. Am. Home Assur. Co.*, 625 F. App'x 803, 804 (9th Cir. 2015) (holding that knowledge of defective paint was not equivalent to knowledge of steel corrosion that the paint was supposed to prevent); *see also* G*olden Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750, 757 (9th Cir. 1996) ("An insured's faulty workmanship is not 'property damage' under California law."), *overruled on other grounds by Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1223–25 (9th Cir. 1998) (en banc).

With that background in mind, the Court next turns to the evidence presented by the parties.  On March 14, 2012, the Regents informed Devcon about interior defects and interior water damage to the bathrooms in the Housing Project caused by Devcon's subcontractors.  ECF No. 140-10 at 35–36.  On March 23, 2012, the Regents informed Devcon that the Regents were going to "continu[e] [their] investigation . . . in regards to other potential defective work including but not limited to: windows, entry doors, deck transitions, cement plaster assemblies including flashing, shower pans at Porter Infill, bathroom ventilation, plumbing shaft assemblies, and bath fan capacity."  ECF No. 140-10 at 48.

On March 26, 2012, a Devcon representative sent an email to Brady that informed Brady of the Regents' allegations and attached the March 23, 2012 letter that indicated that further investigations were underway.  *See* ECF No. 140-10 at 137–38.  In Brady's discovery responses Brady contends that "Brady became aware of allegations of negligent work and related alleged damages at the Project, including the exteriors, at least by March 26, 2012, the date of an email from John Kranich of Devcon to Brady, enclosing" the March 23, 2012 letter.  ECF No. 159, Tenero Decl. ¶ 11, Ex. 10.  "That correspondence included notice that the Regents were investigating multiple issues, including issues involving the building exteriors."  *Id.*

On March 30, 2012, Brady tendered its defense to St. Paul and Travelers.  ECF No. 140-10 at 26–27.  On April 6, 2012, Devcon sent Brady a "formal tender and demand" for

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1   indemnification.  *Id.* at 39.  The April 6, 2012 letter indicated that the Regents' notice to Devcon

2   had "allege[d] deficiencies with the [Housing] Project which include[d], but [were] not limited to,

3   deficiencies related to the shower pan, enclosure system and drywall assemblies."  *Id.* at 41.  The

4   letter also stated that Brady was hired to "install complete metal lath, plaster, gypboard (dry wall)

5   and fireproofing in accordance with the plans for the project," but that "[u]pon our review of the

6   claims present in the [Regents'] notice there is reason to believe there were deficiencies in the

7   performance of Brady's [] work."  *Id.* at 41–42.

8          In mid-September, Brady's expert, who was doing a site visit to inspect the interior

9   bathrooms in relation to the interior defects, noticed that testing was being performed on the

10  exterior stucco, and also noticed that the stucco was cracking.  ECF No. 140-10 at 50–51.  Testing

11  that took place between December 17 and December 20, 2012 indicated that water intrusion and

12  water damage had occurred in the underlying framing of the stucco.  ECF No. 140-10 at 22.  In a

13  December 22, 2016 deposition of Brady's representative, the Brady representative indicated that,

14  as far as he knew, Brady did not know of any other such water damage before December 2012.

15  ECF No. 140-10 at 64.

16          Penn's claim notes from September 3, 2015 state that the 2012-2013 Zurich policy "will

17  not be implicated as insured received notice of the defects in March 2012."  ECF No. 157-4 at 2.

18          Based on this evidence in the record, the Court finds that there is a dispute of material fact

19  as to whether Brady was aware of the exterior property damage before June 1, 2012, the date the

20  2012-2013 Zurich policy went into effect.  On the one hand, the communications from Devcon to

21  Brady only discussed an investigation into "potential exterior defects" and did not provide

22  knowledge specifically of any property damage.  On the other hand, although the Court doubts

23  that notice of "potential exterior defects" constitutes knowledge of property damage, Brady's

24  responses to interrogatories specifically state that "Brady became aware of allegations of negligent

25  work and related alleged damages at the Project, including the exteriors, at least by March 26,

26  2012."  ECF No. 159, Tenero Decl. ¶ 11, Ex. 10.  This interrogatory indicates that the notice from

27  the Regents in March made Brady aware of "damages," and the Court cannot foreclose that

28

19

1   possibility.  Penn points out that Brady's credibility is likely low because Brady seeks to avoid

2   potentially paying a second self insured retention for the 2012-2013 Zurich policy.  However, the

3   Court does not evaluate credibility on a motion for summary judgment.  *Leslie*, 198 F.3d at 1158

4   (holding that courts must assume truth of facts asserted by nonmoving party on a motion for

5   summary judgment).  Accordingly, the Court concludes that there is triable issue of material fact

6   as to whether Brady was "aware by any other means" of property damage.  This issue will

7   determine whether the 2012-2013 Zurich policy and its higher policy limits apply.

8          Accordingly, the Court DENIES Penn's Motion for Summary Judgment against Zurich.

9                    **2.       Penn's Arguments as to American Guarantee**

10         Penn moves for summary judgment in the alternative against American Guarantee.  As

11  discussed in the facts section above, there were three different companies that provided excess

12  insurance to Brady during the relevant time periods in this case.

13         Penn provided excess insurance for two years, from 2004 to 2006.  The primary policies in

14  place during that year were the 2004-2005 St. Paul policy and the 2005-2006 Travelers policy.

15         Everest provided excess insurance for two years, from 2006 to 2008.  The 2006-2007 and

16  2007-2008 Zurich policies were the primary policies in effect during those years.

17         American Guarantee provided annual excess insurance policies to Brady from 2008

18  through 2014, and the Zurich policies were the primary policies in effect during those years.  *See,*

19  *e.g.*, ECF No. 140-7 at 40, 2008-2009 American Guarantee Policy.[3]  Travelers, St. Paul, Penn, and

20  Everest paid $1 million each into the settlement, but American Guarantee made no payment.

21         Penn argues that American Guarantee must reimburse Penn $1 million dollars because the

22  Penn policies were excess to the American Guarantee policies, and that Penn did not need to pay

23  until the American Guarantee policies were exhausted.  In the alternative, Penn argues that Penn

24  and American Guarantee were excess policies on the same "level" and thus should have split the

25

26  _____

27  [3] Although American Guarantee provided excess policies from 2008 through 2014, the Court cites
    to the 2008-2009 American Guarantee policy throughout this section.  The relevant terms of the
    other American Guarantee policies are substantially the same.

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    $1 million settlement payment on a *pro rata* basis.  In response, American Guarantee argues that

2    the American Guarantee policies are not triggered at all because the underlying Zurich policies

3    were never exhausted.  In addition, American Guarantee argues that the American Guarantee

4    policies are excess to the Penn policies.

5         First, the Court discusses whether American Guarantee policies were triggered at all.

6    Second, the Court discusses each of the relevant policies to determine whether the Penn or the

7    American Guarantee policies were excess of each other.

### a.    Were the American Guarantee Policies Triggered?

9         The American Guarantee policies provide Excess Follow Form Liability Insurance, which

10   is denominated "Coverage A" under the American Guarantee policies.[4]  The insuring clause of

11   Coverage A states that American Guarantee "will pay on behalf of the **insured**, those damages

12   covered by this insurance in excess of the total applicable limits of **underlying insurance**."  ECF

13   No. 140-7 at 67.  The term "underlying insurance" is defined as "the policy or policies of

14   insurance listed in the Schedule of Underlying Insurance forming a part of this policy."  *Id.* at 75.

15   In turn, the schedule of underlying insurance lists the Zurich policy in place for the same year as

16   the American Guarantee policy.  *Id.* at 42.  Therefore, the 2008-2009 American Guarantee policy

17   is excess to the 2008-2009 Zurich policy.

18        American Guarantee argues that the underlying Zurich policies never exhausted, and

19   therefore there were no "damages . . . in excess of the total applicable limits of underlying

20   insurance" that the American Guarantee policies covered.  *Id.* at 67.  In the discussion of the Penn

21   Motion above, the Court noted that when a continuing injury occurs, every policy that provides

22   coverage in the years of the continuing injury provides coverage, and the policy limits of those

23   policies aggregate.  *See Montrose II*, 10 Cal. 4th at 689.  The parties agree that the damage caused

24   by Brady's work was a continuing injury and was covered by primary policies at least from 2006

25

26

27   ---
     [4] The Court notes that the American Guarantee policies also contain "Umbrella Liability
     Insurance" as well, which is referred to as "Coverage B."  The parties agree that Coverage B is not
     implicated in this case. American Guarantee Penn Opp'n at 5; Penn. Mot. at 18.

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

up to 2011.[5]  Therefore, at the very least, the 2005-2006 Travelers policy and the 2006-2007, 2007-2008, 2008-2009, 2009-2010, and 2010-2011 Zurich policies would normally all provide primary coverage up to their aggregate limits.  Each Zurich policy provides a $1 million policy limit per occurrence, and therefore the aggregate limit for those Zurich policies over five years would be $5 million per ongoing occurrence.  Thus, American Guarantee's position, while not fully articulated, seems to be that because Zurich only paid $1 million, the aggregate limits have not been satisfied.

However, American Guarantee ignores the antistacking provision in the Zurich policies which states that when multiple Zurich policies apply, "the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy and only that limit shall apply to that occurrence."  ECF No. 140-6 at 545, 2012-2013 Zurich Policy.  Assuming that the 2012-2013 Zurich policy and its $2 million limit do not apply, the "highest applicable limit" in the Zurich's policies was $1 million per occurrence.  Therefore, by paying $1 million, Zurich exhausted the "maximum Limit of Insurance" for all of the Zurich policies that were required to provide coverage under *Montrose II*.

**b.      Which Policy Is Excess: Penn's or American Guarantee's**

Having established that the American Guarantee policies were triggered, the question is whether, once the primary policies were exhausted, American Guarantee should have paid $1 million before Penn or whether Penn and American Guarantee should have shared the payments on a *pro rata* basis.

"When two insurers cover the same level of liability (e.g., both primary or both excess) on the same risk as to the same insured, courts may require each to contribute to the cost of defending the claim or indemnifying the loss."  *Carmel Dev. Co. v. RLI Ins. Co.*, 126 Cal. App. 4th 502, 517

---

[5] The Court notes that Penn and Zurich dispute whether the 2011-2012 or 2012-2013 Zurich policies apply.  The Court addresses this dispute below in the discussion of Zurich's motion and above in the context of Penn's Motion against Zurich.  It is undisputed, however, that the 2005-2006 Travelers primary policy and the 2006-2007, 2007-2008, 2008-2009, 2009-2010, and 2010-2011 Zurich primary policies apply.

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1   (2005).  However, many policies contain provisions that "attempt to limit the insurer's liability to

2   the extent that other insurance policies may cover the same risk."  *Advent, Inc. v. Nat'l Union Fire*

3   *Ins. Co. of Pittsburgh, PA*, 211 Cal. Rptr. 3d 685, 702 (Ct. App. 2016).  These provisions are

4   referred to in the case law as "other insurance" provisions.

5       Where competing excess insurance policies contain "other insurance" provisions that each

6   attempt to limit liability, California courts engage in a two-step inquiry.  First, the Court looks to

7   whether the policies were actually "insuring the same risk at the same level of coverage."  *Carmel*,

8   126 Cal. App. 4th at 509.  If the policies insure the same risk at the same level of coverage,

9   California courts then determine whether the other insurance provisions are in irreconcilable

10  conflict.  *Id.*  If they are in conflict, California courts then split the excess payments between the

11  insurers on a *pro rata* basis.  *Id.*

12      When California courts refer to differing "levels" of coverage in excess insurance policies,

13  they are referring to whether the policy is a "specific excess" or a "general excess" insurance

14  policy.  A specific excess insurance policy is an insurance policy that "provide[s] excess coverage

15  *only* over specified primary policies."  *Flintkote Co. v. Gen. Acc. Assur. Co. of Can.*, 2008 WL

16  3270922, at *19 (N.D. Cal. Aug. 6, 2008).  Thus, a specific excess policy must pay as soon as the

17  limits of the specified underlying insurance are exhausted.  *Id.*  In contrast, general excess

18  insurance policies "provide excess coverage only when all primary policies are exhausted."  *Id.*

19  This is called "horizontal exhaustion" because each primary policy on the lower "level" must

20  exhaust before a general excess policy, which sits on a higher level, becomes implicated.  *Id.*

21      California courts consider specific excess policies to be on a lower level than general

22  excess policies and, thus, specific excess policies must pay before general excess policies.

23  *Carmel*, 126 Cal. App. 4th at 517 (holding that no payment was required from a general excess

24  policy because the other applicable policy was a specific excess policy); *Advent*, 211 Cal. Rptr. 3d

25  at 702 (same).

26      In cases involving continuing losses over multiple years, thus triggering multiple annual

27  policies, the default in California is for an excess insurance policy to be a general excess policy.

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

*Community Redevelopment*, 50 Cal. App. 4th at 340.  However, this default is rebutted if the insurance policy contains language stating that the policy is excess to a specific underlying policy. *Id.*  ("Absent a provision in the excess policy *specifically describing* and *limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases because it is most consistent with the principles enunciated in *Montrose*.").  Even where a specific underlying policy is listed, other provisions in the policies such as the "other insurance" provision may indicate that the policy remains a general excess policy.  *See Flintkote*, 2008 WL 3270922 at *23 ("[T]he court looks broadly at the policy, including the other insurance clause, to determine the level of coverage.") (citation omitted); *Carmel*, 126 Cal. App. 4th at 509 ("This question requires a broader examination of each policy to ascertain the context in which the 'other insurance' provisions appeared.").

The Court now turns to California's two-step inquiry for determining whether excess insurance policies must share *pro rata* or are excess of each other.  The Court first sets forth the relevant policy language from the Penn and American Guarantee policies, and then turns to whether the policies at issue here are specific excess or general excess policies, and finally discusses which of them has priority over the other.

### i.   Policy Language

The insuring clause of the Penn policy contains the following language:

As respects accidents or occurrences, whichever is applicable, taking place during the period of the Policy, [Penn] agrees to afford the Insured such additional insurance as the issuers of the Underlying Coverage specified in the schedule would afford the Insured by increasing the underlying limit combined provided that it is expressly agreed that liability shall attach to [Penn]:

(a) only after the issuers of the Underlying Coverage have paid or have been held liable to pay the full amount of the said underlying limit, and

(b) only as respects such additional amounts in excess thereof as would be payable by the Issuers of the Underlying Coverage if the said underlying limit were amended as aforesaid, and

(c) in no greater amount than the limit(s) set forth under the Declarations ultimate net loss as respects each accident or occurrence, whichever is applicable, taking place during the period of this policy—Subject to the limit(s) set forth under the Declarations ultimate net loss in this aggregate where applicable for each annual

24

period during the currency of this Policy.

ECF No. 140-7 at 24 ("Penn Policy").

The "Underlying Coverage" in the Penn policy is defined as the 2005-2006 Travelers policy.  *Id.* at 25.  Additionally, the term "ultimate net loss" is defined in the following manner: "The words ultimate net loss shall be understood to mean the amount payable in settlement of the liability for the insured after making deductions for all recoveries for other valid and collectible insurance, excepting however the policy(ies) of the primary insurers."  *Id.* at 31.

The American Guarantee policies contain the following language:

SECTION 1. COVERAGES

. . . .

Under **Coverage A,** we will pay on behalf of the **insured,** those damages covered by this insurance in excess of the total applicable limits of **underlying insurance.** With respect to **Coverage** A, the terms and conditions of underlying insurance are made a part of this policy, except with respect to:

> 1. Any contrary provision in this policy; or
>
> 2. Any provision in this policy for which a similar provision is not contained in **underlying insurance.**

With respect to the exceptions stated above, the provisions of this policy will apply.

Notwithstanding anything to the contrary contained above, if **underlying insurance** does not apply to damages, for reasons other than exhaustion of applicable limits of insurance by payments of claims, then **Coverage A** does not apply to such damages.

 . . . .

SECTION V. DEFINITIONS

. . . .

**Other insurance** means a policy of insurance providing coverage that this policy also provides.  **Other insurance** includes any type of self-insurance or other mechanisms by which an insured arranges for funding of legal liabilities.  **Other insurance** does not include **underlying insurance** . . . .

. . . .

**Underlying insurance** means the policy or policies of insurance listed in the Schedule of Underlying Insurance forming a part of this policy.

. . . .

SECTION VI. CONDITIONS

. . . .

If **other insurance** applies to damages that are also covered by this policy, this policy will apply excess of the **other insurance.**

25

United States District Court
Northern District of California

1    ECF No. 140-7 at 40–81 ("American Guarantee Policy").

2         The "Schedule of Underlying Insurance" in the American Guarantee policies refers

3    specifically to the 2008-2009 Zurich policy that was in place the same year as the 2008-2009

4    American Guarantee policy.

5                    **ii.        Specific or General Excess**

6         Penn argues that its policy is a general excess policy because, although it refers to specific

7    underlying coverage, the policy limits its payments to the "ultimate net loss," which is defined as

8    "the amount payable in settlement of the liability for the insured after making deductions for all

9    recoveries for other valid and collectible insurance."  Penn Policy at 12.  American Guarantee

10   argues that Penn's policy is a specific excess policy because (1) the policy specifies underlying

11   insurance and states that payments will be made immediately after that underlying insurance is

12   exhausted, (2) the ultimate net loss definition is vague because the policy does not define "other

13   insurance," and (3) the policy contains no other provision that makes the policy excess to "other

14   insurance."

15        With respect to the American Guarantee policies, American Guarantee argues that even

16   though the policies refer to specific underlying insurance, the "other insurance" provision makes

17   the policies general excess policies.  Penn argues that the American Guarantee policies are specific

18   excess policies because the coverage section of the policies does not mention "other insurance"

19   and that burying an "other insurance" provision later in the policy is insufficient to turn a specific

20   excess policy into a general excess policy.

21        The Court first addresses the American Guarantee policies and then addresses the Penn

22   policy.

23                    **A.        American Guarantee Policies**

24        With respect to the American Guarantee policies, there is California precedent that

25   addresses a substantially similar insurance policy.  In *Carmel*, the California Court of Appeal

26   addressed a dispute between the Fireman's Fund Insurance Company ("Fireman's Fund") and the

27   RLI Insurance Company ("RLI") over which company's excess insurance policy was required to

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

pay first.  *Carmel*, 126 Cal. App. 4th at 509.  The Fireman Fund's insurance policy's coverage provision provided that: "**We** will pay on behalf of the **Insured** those sums in excess of **Primary Insurance** that the **Insured** becomes legally obligated to pay as damages."  *Id.* at 510.  The Fireman Fund's policy also contained an "other insurance" provision in the "Conditions" section of the policy that stated "[i]f there is any (1) **Other Insurance** . . . this policy shall apply as excess of and not contributory with such Insurance."  *Id.*

The *Carmel* court found the policy provisions to indicate that Fireman's Fund "undertook to provide coverage immediately upon exhaustion of [the underlying insurance's] policy limits," which made it a specific excess policy.  *Id.* at 510–511.  Although the policy also contained an "other insurance" provision, which stated that coverage only applied as excess to other insurance, the *Carmel* court held that "[t]he plain language of the Fireman's Fund agreement . . . provided coverage to the insured upon exhaustion of the [underlying insurance's] policy limits."  *Id.* at 511.  Because the policy "buried its limitation on the second to last page in a generally worded 'other insurance' clause," the "insuring language did not clearly and unequivocally inform the insured that it was excess over *all* other insurance, primary and excess."  *Id.*

The American Guarantee policies' provisions are similar to those in the Fireman Fund's policy in *Carmel*.  The insuring clause of the American Guarantee policies states that "we will pay on behalf of the **insured,** those damages covered by this insurance in excess of the total applicable limits of **underlying insurance**."  American Guarantee Policy at 67.  The insuring clause makes no mention of "other insurance."  Given that the language used in the insuring clause here is functionally the same as that in *Carmel*, the Court concludes that this insuring clause language indicates that American Guarantee "undertook to provide coverage immediately upon exhaustion of [the underlying insurance's] policy limits."  *Carmel*, 126 Cal. App. 4th at 510–511.  Thus, the insuring clause supports a finding that the American Guarantee policies are "specific excess" policies.

The presence of the "other insurance" provision in the American Guarantee policies does not alter this finding.  Just as in *Carmel*, the "other insurance" provision is "buried" on the "second

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

to last page" of the American Guarantee policies.  *See* American Guarantee Policy at 79.  As the

*Carmel* court notes, such a practice is "accorded judicial disfavor."  *Carmel*, 126 Cal. App. 4th at

511 (citing *Dart Indus., Inc. v. Comm. Union Ins. Co.*, 28 Cal. 4th 1059, 1080 (2002)).  Moreover,

the language of the "other insurance" provision in the American Guarantee policies is just as

"generally worded" as the provision at issue in *Carmel*.  The provision here states that "[i]f **other**

**insurance** applies to damages that are also covered by this policy, this policy will apply excess of

the **other insurance**."  American Guarantee Policy at 79.  Thus, because the insuring clause

explicitly makes the American Guarantee policies excess to a specific policy and the "other

insurance" provision does not clearly alter that insuring clause, the Court finds that the American

Guarantee policies are "specific excess" policies.  *See also Travelers Cas. & Sur. Co. v. Trans. Ins.

Co.*, 122 Cal. App. 4th 949 (2004) (finding a policy with a specific excess insuring clause and a

later "other insurance" provision to be a specific excess policy overall).

### B.       Penn Policy

The question then is whether Penn's policy is also a specific excess policy or is a general

excess policy.  Penn argues that the Penn policy's definition of "ultimate net loss" causes it to be a

general excess policy.  The Court disagrees.  The Penn policy states that Penn "agrees to afford the

Insured such additional insurance as the issuers of the Underlying Coverage specified in the

schedule would afford the Insured by increasing the underlying limit combined provided that it is

expressly agreed that liability shall attach to [Penn]: [¶] (a) only after the issuers of the Underlying

Coverage have paid or have been held liable to pay the full amount of the said underlying limit."

Penn Policy at 24.  Just like the insuring clause in *Carmel*, this insuring clause specifies a

particular "Underlying Coverage" to which the policy acts as excess insurance.  Moreover, the

insuring clause specifies that the Penn policy is essentially an extension of that underlying policy's

limits and that liability can "attach" to the Penn policy "immediately upon exhaustion of [the

underlying insurance's] policy limits."  *Carmel*, 126 Cal. App. 4th at 510–11.

However, the insuring clause also states that the Penn policy's liability will be "in no

greater amount than the limit(s) set forth under the Declarations ultimate net loss as respects each

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

accident or occurrence." Penn Policy at 24. The Penn policy then defines "ultimate net loss" to mean "the amount payable in settlement of the liability for the insured after making deductions for all recoveries for other valid and collectible insurance, excepting however the policy(ies) of the primary insurers." Penn Policy at 31. Penn argues that this provision effectively states that the Penn policy only must pay the remainder once all other valid and collectible insurance has paid.

However, for the reasons provided below, the Court finds that the definition of "ultimate net loss" in the Penn policy does not "clearly and unequivocally inform the insured that [the Penn policy] was excess over *all* other insurance, primary and excess." *Carmel*, 126 Cal. App. 4th at 511. In *Advent*, the California Court of Appeal found a similar provision defining "ultimate net loss" did not cause a policy to be a general excess policy. There, the policy defined ultimate net loss as losses for which the insured is liable after "making deduction for all recoveries, salvages or *other insurance* (other than recoveries under the policy of the Underlying Insurance) whether recoverable or not." *Advent*, 211 Cal. Rptr. 3d at 705. The *Advent* court noted that "[a]lthough Topa's definition of 'loss' referenced 'other insurance,' the reference was vague. There was no definition of what this "other insurance" included." *Id.* In contrast, the *Advent* court found the "other insurance" definition in the opposing excess insurance policy to be clear. That policy defined "other insurance" to be "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy." *Id.*

The definition of ultimate net loss here, like in *Advent*, also contains ambiguities. First, despite Penn's arguments that deductions should be made for recoveries for "all" other insurance, the definition states that the deduction is for "all recoveries for other valid and collectible insurance." The word "all" modifies recoveries and leaves ambiguous whether the deduction applies to "all other valid and collectible insurances" or just "some other valid and collectible insurances."

Second and relatedly, the definition of ultimate net loss does not speak to the timing of when Penn becomes liable, but rather solely acts to limit the amount of Penn's liability. While a statement that recoveries for "all other valid and collectible insurance" may have indicated that the

29

United States District Court
Northern District of California

Penn policy does not have to pay until all other insurances pay, there is an ambiguity here as to what other insurances are counted. The "all recoveries for valid and collectible insurance" could simply indicate, for example, that at the time the underlying insurance exhausts, all recoveries that have already been collected from primary insurance are deducted.

Finally, the *Advent* court found a definition of "other insurances" sufficiently specific where it included "a valid and collectible policy of insurance providing coverage for damages covered in whole or in part by this policy." *Id.* Here, although the definition of ultimate net loss limits the "other insurances" to those that are "valid and collectible" it does not limit it to other insurances that "provid[e] coverage for damages covered in whole or in part by this policy." *Id.* Based on these ambiguities, the Court cannot conclude that the Penn policy "clearly and unequivocally inform[ed] the insured that [the Penn policy] was excess over *all* other insurance, primary and excess." *Carmel*, 126 Cal. App. 4th at 511.

Accordingly, the Court finds that the Penn policy, like the American Guarantee policies, is a specific excess insurance policy. Thus, the Penn and American Guarantee policies provide the same "level" of coverage, and the Court must proceed to step two of the two-step inquiry.

### iii.    Do the Provisions Conflict?

In the second step of the two-step inquiry, the Court looks at the "other insurance" clauses in each policy to determine if they are in irreconcilable conflict. If they do conflict, the liability is then split between the excess insurers on a *pro rata* basis.

Here, the American Guarantee "other insurance" provision states that "[i]f **other insurance** applies to damages that are also covered by this policy, this policy will apply excess of the **other insurance**." American Guarantee Policy at 79. The only "other insurance" policy in the Penn policy is the definition of "ultimate net loss": "the amount payable in settlement of the liability for the insured after making deductions for all recoveries for other valid and collectible insurance, excepting however the policy(ies) of the primary insurers." Penn Policy at 31.

These two "other insurance" provisions are not irreconcilable. As noted in the prior section, the definition of "ultimate net loss" contains multiple ambiguities. As relevant here, it is

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    possible that the deduction for "all recoveries for other valid and collectible insurances" does not

2    include the recovery on the American Guarantee policies.  In contrast, the American Guarantee

3    "other insurance" provision specifically states that the policy will apply as excess of other

4    insurance that "applies to damages that are also covered by this policy."  Thus, because the

5    American Guarantee policies specifically state that they are excess of the Penn policy, and the

6    Penn policy is ambiguous whether it is excess of the American Guarantee policies, there is not an

7    irreconcilable conflict, and the American Guarantee policies are excess to the Penn policy.  *See*

8    *Advent*, 211 Cal. Rptr. 3d at 705 (finding that specific "other insurance" clause language trumps

9    vague definition of "ultimate net loss").

10          Accordingly, the Court finds that Penn was required to pay up to its policy limits before

11   American Guarantee was required to pay.  Therefore, the Court DENIES Penn's Motion for

12   Summary Judgment against American Guarantee.

### 3.     Penn's Arguments as to Brady

14          Penn also moves for summary judgment against Brady.  Brady brought two counterclaims

15   against all of the insurance companies, including Penn.  The counterclaims seek a declaration that

16   the insurance companies owe Brady a duty to defend in this lawsuit and a duty to indemnify Brady

17   if Brady becomes liable for additional payments.

18          Brady argues that there is a duty to defend because the instant case is a "suit" where the

19   insurance companies are seeking "damages" against Brady because of covered "property damage."

20   Brady Penn Opp'n at 6.  As an initial matter, Brady has failed to cite, and the Court is unaware of,

21   any cases where an insurer has been found to owe a duty to defend and indemnify the insured in a

22   reimbursement action, that is, in an action where the insurer is seeking reimbursement of money

23   spent to indemnify the insured in a covered underlying suit.  Thus, the Court looks to the terms of

24   the policies and general principles of California insurance law to decide whether Penn has a duty

25   to defend and indemnify.

26          Under California law, "[a] liability insurer owes a broad duty to defend its insured against

27   claims that create a potential for indemnity."  *Montrose Chem. Corp. v. Superior Court*, 6 Cal. 4th

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

287, 295 (1993) ("*Montrose I*") (quoting *Horace Mann Ins. Co. v. Barbara B.*, 4 Cal. 4th 1076, 1081 (1993)).  However, if there was no potential for coverage under the insurance policy based on the underlying complaint and extrinsic facts made known to the insurer, then the insurer has not breached the insurance contract by refusing to defend.  *Id.* at 295 (holding that duty to defend ends when it is apparent there is "no potential for coverage").  Because the duty to defend is broader than the duty to indemnify, the Court addresses Brady's duty to defend and duty to indemnify claims together.

Here, as discussed in the factual background section, St. Paul provided primary coverage to Brady in 2004-2005, Travelers provided primary coverage to Brady in 2005-2006, and Zurich provided primary coverage to Brady from 2006 onward.  The Penn policy is an excess policy that was in effect in 2004-2005 and 2005-2006.  In the Penn policy, Penn agreed to "afford the Insured such additional insurance as the issuers of the Underlying Coverage specified in the schedule would afford."  Penn Policy at 24.  This means that to determine the scope of coverage provided by Penn, the Court looks to the substantive provisions of the primary insurance policies that provided coverage at the time, the St. Paul and Travelers policies.

The St. Paul policy agrees to pay "amounts any protected person is legally required to pay as damages for covered bodily injury or property damage."  ECF No. 38-1 ("St. Paul Policy") at 23.  The Travelers policy agrees to pay "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  ECF No. 38-2 ("Travelers Policy") at 36.  Moreover, both policies assert that there is a duty to defend "a claim or suit for injury or damage . . . covered by this agreement."  St. Paul Policy at 25; Travelers Policy at 36 ("We will have the right and duty to defend the insured against any 'suit' seeking" damages for "'property damage' to which this insurance applies.").

In this case, the only claims against Brady are made by Zurich, Brady's primary insurer from 2006 onward.  Zurich's sixth cross-claim asserts that, if Zurich is found to owe more under the 2012-2013 Zurich policy or any other policy, then Brady owes Zurich another "self insured retention."  "The term 'retention' (or 'retained limit') refers to a specific sum or percentage of loss

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

that is the insured's initial responsibility and must be satisfied before there is any coverage under the policy.  It is often referred to as a 'self-insured retention' or 'SIR.'"  *Forecast Homes, Inc. v. Steadfast Ins. Co.*, 181 Cal. App. 4th 1466, 1474 (2010) (quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2008) ¶ 7:384, p. 7A–126); *see also* ECF No. 140-6 at 517, 2012-2013 Zurich Policy ("[I]t is a condition precedent to our liability that you make actual payment of 'self insured retention' and 'defense costs' for each 'incident', until you have paid 'self insured retention' and 'defense costs' equal to the [total self insured retention].").

For an insurer to have duty to defend, the California Supreme Court has held that there must be a potential duty to indemnify the insured under the insurance policy.  *Montrose I*, 6 Cal. 4th at 295.  Thus, for Brady to show that Penn has a duty to defend Brady, Brady must show that Penn potentially has a duty to indemnify Brady under the Penn excess policies for the only damages asserted against Brady in the instant suit, the payment of an additional self insured retention.  However, self insured retentions are, by definition, an amount of money that the insured pays "before there is any coverage" under a policy.  *Forecast*, 181 Cal. App. 4th at 1474.  Although Penn issued excess insurance policies that do not contain their own self insured retention requirements, California courts have held that excess insurers have no duty to defend or indemnify an insured before that insured pays the self insured retention required for all primary policies.  *See Padilla Const. Co. v. Transp. Ins. Co.*, 150 Cal. App. 4th 984, 1002 (2007) ("[A]n 'excess insurer' does not have a duty to defend an insured until 'primary insurance' in the form of a so-called 'self-insured retention' is exhausted.") (quoting *Aerojet-Gen. Corp. v. Transp. Indem*. Co., 17 Cal. 4th 38, 72 (1997) (as modified)).  Therefore, Brady's self insured retention payment obligation is an amount of money that must be paid before Penn becomes liable, not an amount for which Penn must indemnify Brady.

Moreover, a claim for a self insured retention is not the same as a claim for "damages for covered bodily injury or property damage."  St. Paul Policy at 23.  The "damages" Zurich seeks in the form of a self insured retention are not damages for property damage, but damages for breach of contract.  Brady agreed to pay Zurich the self insured retention before Zurich makes any

1    payments on the 2012-2013 Zurich policy.  ECF No. 140-6 at 54, 2012-2013 Zurich Policy.  If

2    Zurich must make payments on the 2012-2013 Zurich policy based on a court order, then Brady is

3    in violation of their contractual agreement if Brady does not pay the self insured retention.  All of

4    the commercial general liability policies exclude coverage for damages arising from "breach of

5    contract," even when they are somehow related to property damage that was covered in the first

6    instance.  *See, e.g.*, ECF No. 140-6 at 525, 2012-2013 Zurich Policy.  Thus, these damages are

7    specifically excluded from coverage.

8         Brady's analogy to a suit where another subcontractor "su[es] Brady for equitable

9    indemnity to recover damages that subcontractor paid to settle the Underlying Action" is a false

10   analogy.  Brady's Penn Opp'n at 6.  In such an action, the issue would be the amount of damages

11   that are owed on the underlying covered physical damage, not the contractual allocation of

12   expenditures among the insurers and the insured's self insured retention.

13        Moreover, the Court notes that reimbursement coverage actions are regularly brought

14   against insured individuals for reimbursement where the insurer provided a defense or contributed

15   to a settlement subject to a reservation of the rights.  *See Scottsdale Ins. Co. v. MV Transp.*, 36

16   Cal. 4th 643, 662 (2005) ("[A]n insurer under a standard [commercial general liability] policy,

17   having properly reserved its rights, may advance sums to defend its insured against a third-party

18   lawsuit, and may thereafter recoup such costs from the insured if it is determined, as a matter of

19   law, that no duty to defend ever arose.").  As noted at the beginning of this section, Brady has

20   failed to cite and the Court is unaware of any cases where the insurer owes a duty to defend, and

21   must pay defense costs in the same suit where it also seeks reimbursement.  Indeed, in such suits,

22   with few exceptions, the insured is not even entitled to attorney's fees unless otherwise provided

23   for by contract or statute.  *See Essex Ins. Co. v. Five Star Dye House, Inc.*, 38 Cal. 4th 1252, 1257

24   (2006) (noting "general rule that each party to litigation must pay its own attorney fees").

25        Accordingly, because the damages sought against Brady in this suit are not even

26   potentially covered, and Brady has not shown that a duty to defend otherwise exists in coverage

27   litigation, the Court holds that Penn has no duty to defend or indemnify Brady in the instant suit.

28

34

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1    Therefore, the Court GRANTS Penn's Motion for Summary Judgment as to Brady's cross-claims.

2         **B.      Travelers' Motion**

3         Penn's first claim for declaratory judgment, third claim for equitable subrogation, and fifth

4    claim for unjust enrichment seek reimbursement against Travelers on the theory that two

5    "occurrences" were at issue in the underlying litigation, and therefore Travelers owed $2 million

6    rather than $1 million under Travelers' $1 million per occurrence policy limit (collectively,

7    "Reimbursement Counterclaims").  Penn's second claim for declaratory judgment, fourth claim

8    for equitable subrogation, and sixth claim for unjust enrichment seek attorney's fees payments

9    from Travelers under the Travelers policy's "Supplemental Payments" provision (collectively,

10   "Attorney's Fee Counterclaims").

11        Travelers moves for summary judgment against Penn on all six counterclaims.  The Court

12   notes that the exact same claims have also been asserted against Zurich, and Zurich has moved for

13   summary judgment on those claims on the same bases.  Therefore, in this section, the Court

14   addresses both Zurich's and Travelers' arguments.  The Court first addresses whether the

15   underlying action involved multiple occurrences rather than a single occurrence, and then

16   addresses whether attorney's fees are owed under the Supplementary Payments provision of the

17   Travelers policy.

18              **1.      Multiple Occurrences**

19        Zurich and Travelers make two arguments concerning the number of occurrences.  First,

20   they argue that, as a matter of law, there was only a single occurrence in this case.  Second, they

21   argue that even if there were potentially two occurrences, Penn has failed to show any evidence of

22   covered property damage.  The Court addresses each in turn.

23              **a.      Whether There is a Single Occurrence as a Matter of Law**

24        The Travelers and Zurich policies in this case define "occurrence" as "an accident,

25   including continuous or repeated exposure to substantially the same general harmful conditions."

26   Travelers Policy at 49.   The parties agree that, under California law, the Court must apply the

27   "cause" rule to determine the number of occurrences.  Travelers Mot. at 14; Penn's

28   
Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1    Travelers/Zurich Opp'n at 14.  Under the "cause" rule, occurrence "has generally been held to

2    mean the underlying cause of the injury, rather than the injury or claim itself."  *State v. Cont'l Ins.*

3    *Co.*, 88 Cal Rptr. 3d 288, 315 (Ct. App. 2009), *aff'd sub nom. State v. Cont'l Ins. Co./(Employers*

4    *Ins. of Wausau)*, 55 Cal. 4th 186 (2012) (as modified) (citations and internal quotation marks

5    omitted).  "When all injuries emanate from a common source or process, there is only a single

6    occurrence for purposes of policy coverage . . . . Conversely, when a cause is interrupted, or when

7    there are several autonomous causes, there are multiple 'occurrences' for purposes of determining

8    policy limits and assessing deductibles."  *Caldo Oil Co. v. State Water Res. Control Bd.*, 44 Cal.

9    App. 4th 1821, 1828 (1996) (as modified).

10          Under this interpretation of occurrence, courts have found a single occurrence arising from

11   multiple discrete events where those events were caused by the same or a repeated act or omission.

12   For example, in *Haerens v. Commercial Cas. Ins. Co.*, 130 Cal. App. 2d Supp. 892 (1955), the

13   California Court of Appeal held that multiple window scratches caused by the same sanding

14   process constituted a single occurrence.  *Id.* at 893–94.  Similarly, in *Chemstar, Inc. v. Liberty*

15   *Mutual Insurance Co.*, 41 F.3d 429 (9th Cir. 1994), the Ninth Circuit discussed a case where a

16   manufacturer failed to provide a warning that the use of high-periclase lime on indoor walls would

17   cause unsightly "pitting" in the walls.  *Id.* at 433.  The Ninth Circuit held that although 28 homes

18   had suffered from pitting through the indoor use of high-periclase lime, there was only a single

19   occurrence because the damage was caused by the "same underlying cause," the insured's failure

20   to warn.  *Id.*

21          However, where distinct proximate causes create the relevant harm, courts find multiple

22   occurrences.  For example, in *Landmark American Insurance Co. v. Liberty Surplus Insurance*

23   *Corp.*, 2014 WL 12558121 (C.D. Cal. April 9, 2014), a district court in the Central District of

24   California addressed whether multiple occurrences were at issue in a construction defect case.  *Id.*

25   at *5.  The excess insurers in that case argued that there were two occurrences, namely, the

26   defective installation of: (a) window systems and sliding glass doors, and (b) glass handrails along

27   second and third floor balconies.  *Id.*  The defective window installation allowed water leakage

28
Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    due to "a failure to properly apply sealant and improper integration of the window or door system

2    with its perimeter sealant and the adjacent membranes." *Id.*  In contrast, on the guard rails, the

3    builders "allegedly improperly installed lag screws attached to clips fastened to the deck structure,

4    which penetrated the waterproofing elements of the rails and substrates, and also used machine

5    bolts that were too long for the apparatus and resulted in further penetrations of the waterproofing

6    system." *Id.*  Although both defective installations allowed water leakage, "it [was] undisputed

7    that the water leakage at each site was caused by fully distinct installation defects." *Id.*

8           The primary insurers in *Landmark* argued that there was still only one occurrence because

9    "both of the alleged defects were installed by the same company on the same property pursuant to

10   the same contract." *Id.*  However, the *Landmark* court noted that if a "general negligent approach

11   to its construction projects" were sufficient to make multiple occurrences a single occurrence, then

12   there would "rarely be multiple 'occurrences' under the policies." *Id.*  The *Landmark* court

13   therefore held that "[d]istinct accidents caused by distinct defects in distinct areas of the property

14   cannot be treated as a single occurrence under California law." *Id.*

15          The circumstances at issue here are largely the same as those in *Landmark*.  The

16   undisputed evidence indicates that Brady performed two different types of work for which

17   payments were made in the settlement.  On the exterior of the building, Brady installed metal lath,

18   stucco, architectural reveals, and weather barriers.  ECF No. 140-10 at 131–32.  Defects in certain

19   aspects of the exterior siding allowed damage from water intrusion to occur.  *Id.*  On the interior of

20   the building, Brady improperly installed green board backing in the bathrooms, which allowed

21   moisture to wick up and absorb into the walls and damaged the bathtubs.  *Id.* at 132.  There is no

22   evidence that the defective stucco installation was caused by the same type of actions as the

23   interior defective green board installation or vice versa.  Indeed, the record shows that completely

24   different individuals did the work and different foremen supervised the exterior and interior work.

25   ECF No. 140-6 at 124–28 (discussing interior and exterior foremen).

26          Zurich and Travelers, in response, argue that the defects in this case were not caused by

27   separate installation defects, but are both caused by the negligent supervision of Devcon.  Zurich

28
37

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1   Mot. at 12; Travelers Mot. at 17.  In support of this argument, Travelers and Zurich point to *State*

2   *Farm Fire & Cas. Co. v. Elizabeth N.*, 9 Cal. App. 4th 1232, 1238 (1992), and *Mead Reinsurance*

3   *v. Granite State Ins. Co.*, 873 F.2d 1185, 1188 (9th Cir. 1988).  However, both cases are

4   distinguishable.

5          In *Elizabeth N.*, the wife of a pedophile was held liable for her negligent supervision of her

6   husband, who regularly engaged in child abuse.  The California Court of Appeal held that the

7   wife's negligent supervision of each child was a separate, single occurrence because "[t]he

8   stipulated facts establish that [the wife] negligently failed to provide adequate care and supervision

9   for the children, which resulted in repeated molestation of the children by [the husband].

10  Therefore, the multiple injuries suffered by each child resulted from repeated exposure to

11  substantially the same general conditions." *Elizabeth N.*, 9 Cal. App. 4th at 1238.

12         However, the Court also held that the molestation to each child was a separate occurrence.

13  *Id.* (citing *Mason v. Home Ins. Co. of Ill.*, 177 Ill. App. 3d 454, 456 (1988) (holding that injury to

14  each individual in restaurant by common bad batch of food was a separate occurrence)).  Thus,

15  *Elizabeth N.* indicates that negligent supervision can constitute a single occurrence, but only if that

16  negligent supervision causes "continuous or repeated exposure to substantially the same general

17  harmful conditions." *Id.*  Here, even if negligent supervision did cause the interior and exterior

18  damage, the "harmful conditions" caused by that negligent supervision were completely different.

19  *See* ECF No. 140-10 at 131–32 (indicating that the damage and the cause of the damage on the

20  interior and exterior of the Housing Project building were completely different).

21         In *Mead Reinsurance*, the Ninth Circuit addressed insurance held by a municipality on

22  claims brought under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for having a

23  policy of "condoning excessive police force."  *Mead Reinsurance*, 873 F.2d at 1188.  Although the

24  case involved allegations of excessive police force against multiple people, the Ninth Circuit noted

25  that each of those "multiple occurrences may constitute a single municipal policy" and "may be

26  necessary to prove the policy."  *Id.*  Therefore, the Ninth Circuit held that "the policy of condoning

27  police brutality" was a single occurrence.  *Id.*  However, the Ninth Circuit held that separate

28

United States District Court
Northern District of California

allegations of "police harassment" constituted a separate occurrence because it did not involve "excessive force."  *Id.*

Here, the exterior and interior damage allegedly caused by Devcon's "negligent supervision" is more like the separate "police harassment" and "excessive force" allegations in *Mead Reinsurance* than a single policy of excessive force.  The harms to the interior and exterior of the Housing Project were caused by different people, different events, and different acts of negligence.  There has been no showing that the "negligent supervision" that allegedly caused the interior damage is the same as the "negligent supervision" that caused the exterior damage.  Thus, Travelers and Zurich have failed to show that Devcon's negligent supervision caused the Regents to be exposed to "continuous or repeated exposure to substantially the same general harmful conditions," which is required to show a single occurrence under the Travelers and Zurich policies.[6]  Rather, the allegations here are equivalent to those in *Landmark*: that the harms were caused by Devcon's "general negligent approach" to supervising construction projects. *Landmark*, 2014 WL 12558121 at *5.  As the *Landmark* pointed out, such an interpretation would mean that there would never be more than a single occurrence in the course of a single construction project, no matter how disparate the harms.  *Id.*

Finally, Zurich and Travelers have failed to produce evidence of a connection between Devcon's negligent supervision and the harm caused by Brady.  Zurich and Travelers solely rely the Regents' first amended complaint against Devcon, ECF No. 140-5 at 168, and Devcon's cross-

_____

[6] The Court also notes that the insured in *Mead Reinsurance* was the municipality with a single policy involving the use of excessive force, and in *Elizabeth N.*, the insured was the wife who committed negligent supervision.  The parties have not cited, and the Court is unaware of, any case that has found a single occurrence where the insured committed multiple, causally distinct acts, even when those events shared a common negligent supervisor.  *Cf. Haerens*, 130 Cal. App. 2d Supp. 892 (1955) (finding window scratches single occurrence because caused by the same sanding process by the same person); *Chemstar*, 41 F.3d 429 at 438 (finding pitting of walls caused by high-periclase lime to be a single occurrence due to manufacturer's failure to warn where the manufacturer was the insured).  Here, the insured is Brady, the party that committed separate acts of negligence, rather than Devcon, the party that allegedly was negligent in its supervision of Brady.  Brady is being held liable and is insured for its own acts of negligence, not Devcon's acts of negligence.  Accordingly, because each of Brady's acts is a separate, causally distinct event, Brady's acts constitute more than a single occurrence.

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1    complaint against Brady, ECF No. 140-5 at 188, to show that Devcon's negligent supervision was

2    a proximate cause of the harm Brady caused on both the interior and exterior of the Housing

3    Project buildings.  Zurich and Travelers fail to produce any evidence that (1) Devcon was actually

4    negligent as a supervisor, or (2) that Devcon's negligent supervision was the proximate cause of

5    the harm.

6        Accordingly, the Court cannot grant Travelers' (or Zurich's) motions for summary

7    judgment based on a theory that there was a single occurrence as a matter of law.

### b.    Evidence of Only a Single Occurrence

9        In the alternative, Zurich and Travelers argue that even if the interior and exterior damage

10   constitute separate occurrences, there is no evidence that the interior defects caused covered

11   property damage, leaving only a single occurrence.  Commercial general liability policies draw a

12   distinction between defects in an insured's work and property damage.  Specifically, commercial

13   general liability policies, like those at issue here, exclude all coverage for damage to the insured's

14   work and to the materials the insured supplies as part of that work.  *See, e.g.*, Travelers Policy at

15   50 (excluding coverage for "your work," which is defined as "[w]ork or operations performed by

16   you or on your behalf; and [m]aterials parts or equipment furnished in connection with such work

17   or operations.").  "Once the insured's work is complete, the policy covers damage to property

18   provided by others, including property that the insured's work was 'performed on,' but it doesn't

19   cover damage to the insured's own product or work."  *Kaady*, 790 F.3d at 998.  Therefore, Zurich

20   and Travelers are correct that, if there is no evidence of damage to other property, there was only a

21   single occurrence at issue in this case, the exterior damage.

22       Although Zurich and Travelers concede that the work Brady did itself was damaged by the

23   defective installation, they assert that there is no evidence that the work actually caused damages

24   to other property.  Additionally, Travelers alone asserts that, even if there is evidence of interior

25   property damage, there is no evidence that any such interior property damage occurred between

26   June 1, 2005 and June 1, 2006, when the Travelers policy was in effect.  The Court addresses each

27   argument in turn.

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

United States District Court
Northern District of California

1    As discussed in the fact section, Brady's job in the interior of the building was the

2    installation of drywall and drywall assemblies.  In the bathrooms, Brady installed green board,

3    which is intended to provide a protective backing to bathroom walls.  Travelers asserts that, even

4    though Brady improperly installed the green board, the only evidence in the record shows damage

5    to the green board itself and not damage to any property surrounding the green board.  Travelers

6    Mot. at 16.

7    To support its motion, Travelers' expert opines that Brady's interior work did not damage

8    any property.  ECF No. 131-4 at 28 ("No property damage at the Project is attributable to Brady's

9    installation of gypsum board.").  Travelers then goes through some of the evidence provided by

10   Penn's expert and asserts that it only shows damage to the green board itself and not to any other

11   property.  For example, the expert report from Penn's expert states that defective installation of

12   green board would "allow water to wick up into the green board and cause damage to the green

13   board, and building components adjacent to the green board."  ECF No. 13-4 at 58.  From this

14   evidence, Travelers asserts that while there is evidence that the green board itself was damaged,

15   there is no evidence that other property was damaged.  Travelers Mot. at 16.

16   Although Travelers discusses Penn's evidence in depth to argue that the only interior

17   damage was to the work performed by Brady, the Court need not address each piece of evidence in

18   detail, because there is evidence contradicting Travelers' argument.  Penn's expert report notes

19   that "the defective condition of the green board set directly onto the tub rim . . . occurred

20   'throughout'" the Housing Project.  ECF No. 131-4 at 59.  As a result, the Regents' investigators

21   found that "there wasn't a single tub they inspected that didn't have resultant damage."  *Id.*

22   Penn's expert then stated a professional opinion that "the defective installation of green board by

23   Brady at the bathtubs contributed to property damage in the infill housing bathrooms."  *Id.*  Penn's

24   opposition to Travelers' and Zurich's motions also points to an expert-created list of "Defects

25   Allocated to Brady," which includes multiple damages surrounding the bathtubs, such as damaged

26   baseboard.  ECF No. 164-1 at 201.  From that list, which included repairs to both Brady's work

27   and other damaged parts of the bathroom, an expert estimated that the cost of repair for Brady's

28

41

United States District Court
Northern District of California

1 defects would be $445,076.13.  *Id.* at 175.  The Court need not continue to pull examples from the

2 record.  There is evidence both for and against Zurich's and Travelers' position, and therefore a

3 triable issue of material fact exists as to whether the faulty installation of the green board caused

4 property damage.

5 Regardless, Travelers argues that even if there was evidence of property damage caused by

6 the green board installation, there is no evidence of property damage from June 1, 2005 to June 1,

7 2006 when the Travelers policy was in effect.  Travelers notes that the only evidence that Penn

8 presents of when the property damage started in the interior was the expert report of Thomas Butt.

9 ECF No. 140-5 at 128.  That declaration is attached to a motion in related litigation involving

10 Therma Corporation, another subcontractor at the Housing Project.  Thomas Butt opines that "the

11 water damage that was caused by, among other things, the flaws in Therma's work in the

12 installation of the showers and tubs began to take place within no more than six months after the

13 showers and tubs were first put to use in October 2004."  *Id.*  Travelers asserts that this declaration

14 is "wholly irrelevant" because it refers to damage caused by Therma Corporation, not Brady.

15 However, the Court notes that it is not an unreasonable inference that water damage caused by

16 faulty shower and tub installation would also be accompanied by water damage to the tubs caused

17 by faulty green board installation.  Accordingly, the Court finds a triable issue of material fact

18 with respect to whether property damage manifested during the Travelers policy period.

19 Therefore, because there was not a single occurrence as a matter of law and Travelers and

20 Zurich have not satisfied their burden of showing that there was only a single occurrence of

21 property damage, the Court DENIES Travelers' Motion for Summary Judgment against Penn

22 based on the single occurrence theory.  The Court does not make a similar ruling as to Zurich

23 because Zurich makes additional arguments in its motion that the Court addresses in the section

24 concerning Zurich's Motion below.

25 ### 2.        Attorney's Fees

26 Travelers and Zurich also move for summary judgment on Penn's claims that Travelers

27 and Zurich owe attorney's fees under the "Supplementary Payment" provisions of their policies.

28

42

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

1   Under the Supplementary Payments provision Zurich and Travelers agreed that "[w]e will pay,

2   with respect to any claim we investigate or settle, or any "suit" against an insured we defend . . .

3   all costs taxed against the insured in the 'suit.'"   Travelers Policy at 43.  Penn argues that based on

4   the structure of the settlement in this case, costs were taxed against Brady.  The settlement in this

5   case first involved Devcon and the Regents settling for $32 million.  Devcon then sued its

6   subcontractors, including Brady, for indemnification of the settlement amount.  Although the

7   Regents-Devcon settlement allocated $3.8 million to costs and attorney's fees, the Devcon-Brady

8   settlement did not mention costs or attorney's fees at all.  Penn argues, however, that the Regents'

9   costs were baked into the $4 million Devcon-Brady settlement and therefore constitute taxed costs.

10      Penn is wrong.  In *Golden Eagle Insurance Co. v. Insurance Co. of the West*, 99 Cal. App.

11   4th 837 (2002), the California Court of Appeal addressed a similar claim.  In that case, as here, a

12   contractor was sued for construction defects and the contractor brought cross-claims against its

13   subcontractors for indemnity, including for costs of suit.  *Id.* at 842.  The *Golden Eagle* court held

14   that the costs incurred in the third-party lawsuit against the contractor were considered to be

15   *damages* covered by the insuring provision of the commercial general liability policy.  *See id.* at

16   845–46 (insurance policy providing that the insurer will pay all sums the insured becomes "legally

17   obligated to pay as damages because of . . . ''bodily injury' or 'property damage.'").  In making its

18   determination, the *Golden Eagle* court relied on a Ninth Circuit decision interpreting Alaska law,

19   *R.W. Beck & Assoc. v. City and Borough of Sitka*, 27 F.3d 1475 (9th Cir. 1994).  In the *Beck*

20   case, the Ninth Circuit held, while interpreting a commercial general liability policy, that costs incurred

21   in a third-party lawsuit were "'damages' covered under the contractual liability provisions of

22   Sitka's policy, as opposed to 'costs' covered by supplementary payment provisions, which applied

23   to 'costs taxed against [the insured] in any suit defended by' the insurer."  *Id.* at 1484.

24      The *Golden Eagle* court noted one additional requirement for holding that costs are

25   damages under the insuring clause of the commercial general liability policy.  Commercial general

26   liability policies usually contain an exclusion for damages incurred "by reason of the assumption

27   of liability in a contract or agreement."  *Golden Eagle*, 99 Cal. App. 4th at 846.  However, there is

28   43

an exception for "insured contracts," that is, contracts where the insured "assume[s] the tort liability of another party to pay for . . . 'property damage' to a third person or organization." *Id.* "If there is a single key factor or element on which to focus when trying to determine whether a contract is an insured contract, it is the insured's assumption of liability under the contract at issue." *Id.* at 846–47.  In *Golden Eagle*, the subcontractor's agreement with the contractor satisfied the "insured contract" requirement because it stated that the subcontractor would "indemnify, defend and save harmless Contractor . . . from . . . any and all claims, demands, causes of action, damages, costs, expenses, losses or liability, in law or in equity." *Id.* Accordingly, the *Golden Eagle* held that the subcontractor's insurer was liable to pay for the contractor's costs in the third-party action as damages.

  *Golden Eagle* is directly on point here.  Devcon has passed costs and attorney's fees incurred in the Regents' third-party action against Devcon to Brady.  Just as in *Golden Eagle*, so long as Brady and Devcon's subcontract agreement is an "insured contract," the costs passed through to Brady are covered "damages" rather than "taxed costs" that must be paid out of the policies' Supplementary Payments provision.  *See Golden Eagle*, 99 Cal. App. 4th at 848 (citing approvingly *Beck*, 27 F.3d at 1484 (holding that costs from a third party action were "damages" under the policy rather than "taxed costs" under a Supplementary Payments provision)).  Thus, the Court turns to whether the Devcon-Brady contract was an insured contract.

  The insurance contracts and indemnification agreement here are substantially the same as in *Golden Eagle*.  The Travelers policy and the Zurich policies cover "sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage.'"  Travelers Policy at 36; ECF No. 140-6 at 32, 2006-2007 Zurich Policy.  Additionally, the Travelers and Zurich policies do not cover liability incurred as a result of contracts with the exception of "insured contracts," which are defined as contracts "pertaining to your business . . . under which you assume the tort liability of another party to pay for . . . 'property damage' to a third person." Travelers Policy at 37; ECF No. 140-6 at 44, 2006-2007 Zurich Policy.   Finally, as in *Golden Eagle*, Brady's contract with Devcon provides that:

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

United States District Court
Northern District of California

> [Brady] shall indemnify and save harmless [Devcon] . . .from any and all claims, demands, causes of action in law or in equity, damages, penalties, costs, expenses, actual attorneys' fees, experts' fees, consultants' fees, judgments, losses or liabilities, of every kind and nature whatsoever arising out of or in any way connected with or incidental to, the performance of the Work under this Agreement."

ECF No. 140-10 at 6.  This provision is essentially the same as the indemnification provision at issue in *Golden Eagle*.  Accordingly, the Court finds that the agreement between Devcon and Brady is an "insured contract" within the meaning of the Travelers and Zurich policies.

Accordingly, under *Golden Eagle* and *Beck*, Penn's claim against Travelers and Zurich for the Regents' costs under the Supplementary Payment provision fails because the allegedly "taxed costs" are considered damages under those policies. Therefore, the Court GRANTS Travelers' Motion for Summary Judgment as to Penn's second, fourth, and sixth counterclaims, all of which involve claims under the supplementary payments provision.

## C.    Zurich's Motion

Zurich moves for summary judgment on all of Penn's counterclaims.  Penn's first, third, and fifth counterclaims for declaratory judgment, equitable subrogation, and unjust enrichment, respectively, seek reimbursement from Zurich based on three theories: (1) there were multiple "occurrences," which increases the Zurich policy limits, and (2) the 2012-2013 Zurich policy applies.  Penn's second, fourth, and sixth counterclaims for declaratory judgment, equitable subrogation, and unjust enrichment, respectively, seek reimbursement from Zurich based on the Supplementary Payments provision in the Zurich Policy.

The Court first discusses attorney's fees, then the Court addresses multiple occurrences, and finally the Court addresses the 2012-2013 Zurich policy.

### 1.    Attorney's Fees

In the section concerning attorney's fees as part of the Travelers Motion, the Court addressed attorney's fees under both the Travelers policy and the Zurich policies.  Accordingly, as with the Travelers Motion, the Court GRANTS Zurich's Motion for Summary Judgment as to Penn's second, fourth, and sixth counterclaims.

45

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2. Multiple Occurrences

Zurich makes three arguments why Penn's counterclaims fail with respect to the "multiple occurrences" theory.  First, Zurich argues that only a single occurrence is at issue as a matter of law.  Second, Zurich argues that there is no evidence of interior property damage and therefore only a single covered occurrence, exterior property damage, actually occurred.  Third, Zurich argues that adding another "occurrence" would require Brady to pay another self insured retention for coverage to be triggered, which did not occur here.

In the section concerning Travelers' Motion, the Court already addressed the first and second arguments that Zurich makes in its Motion.  Indeed, the Court noted that it was addressing Zurich's as well as Travelers' arguments as part of the discussion of Travelers' Motion.  For the first argument, the Court determined that Zurich and Travelers have not established that a single occurrence was at issue as a matter of law.  For the second argument, the Court found that there was a triable issue of material fact as to whether covered interior property damage occurred.  Therefore, the only remaining question is whether the self insured retention prevents coverage in this case.

"The term 'retention' (or 'retained limit') refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied before there is any coverage under the policy.'" *Forecast*, 181 Cal. App. 4th at 1474 (quoting Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2008) ¶ 7:384, p. 7A–126).  The Zurich policies impose a self insured retention that must be paid before Zurich has any obligation to pay under the Zurich policies.  *See* ECF No. 140-6 at 66, 2006-2007 Zurich Policy ("In the event of your refusal to respond to your obligations for the payment of 'self insured retention' amounts or 'defense costs' for any reason, we shall not make payments for you.").  The Zurich policies in this case impose a new self insured retention for each occurrence.  ECF No. 140-6 at 64 (indicating that the self insured retention is "per occurrence").

Based on this language in the Zurich policies, Zurich argues that even if there is more than one occurrence, Zurich has no obligation to pay on the second occurrence because Brady has not

46

United States District Court
Northern District of California

1   paid the self insured retention for that second occurrence.  Penn does not respond to this argument

2   at all.  *See* Penn Travelers/Zurich Opp'n at 10 (solely addressing argument that self insured

3   retention is necessary before the 2012-2013 Zurich policy can provide payment).

4          The Court agrees with Zurich that unless Brady pays a second self insured retention,

5   Zurich has no obligation to pay additional money for a second occurrence.  The plain language of

6   the Zurich policy states that each occurrence requires an additional self insured retention be paid

7   before Zurich's obligations for indemnity begin.  However, the Court also notes that Zurich has

8   brought a cross-claim against Brady that states that "to the extent the Court concludes the

9   Underlying Action involves more than one occurrence, or to the extent [Zurich's policies] apply to

10  this loss, Brady owes Zurich [] payment of additional self-insured retentions by application of the

11  self-insured retention endorsements in the Zurich [] policies."  ECF No. 91 at 14–15.  This cross-

12  claim states that a finding of more than one occurrence would require Brady to pay an additional

13  self insured retention.  If Brady is ordered to pay an additional self insured retention, then Zurich's

14  cross-claim would become moot.  Thus, because Zurich may be held liable for multiple

15  occurrences, the Court DENIES Zurich's Motion for Summary Judgment against Penn on the

16  theory that only a single occurrence is at issue.

17          3.      **2012-2013 Zurich Policy**

18          As noted in the section concerning the Penn Motion, above, there is a triable issue of

19  material fact as to whether the known loss provision in the 2012-2013 Zurich Policy prevents that

20  policy from applying.  However, in Zurich's Motion, Zurich argues that recovery is not available

21  to Penn on its counterclaims as a matter of law with respect to its 2012-2013 Zurich policy theory.

22  Zurich argues that Penn's third counterclaim for equitable subrogation fails because (1) the 2012-

23  2013 Zurich policy's self insured retention has not been satisfied, and (2) Brady "elected" the

24  2006-2007 Zurich policy and therefore Penn cannot force a change to that election.  Zurich also

25  argues that Penn's first, third, and fifth counterclaims for declaratory relief, equitable subrogation,

26  and unjust enrichment fail because Penn's policy is a "specific excess" policy that would make

27  Penn liable to pay even if the 2012-2013 Zurich policy applied.

28
                                                47

1     The Court first addresses Zurich's argument concerning the self insured retention, then

2 addresses Zurich's argument concerning Brady's "election" of the 2006-2007 Zurich policy and

3 finally addresses Zurich's argument that Penn would have to pay regardless.

### A. Self Insured Retention for the 2012-2013 Zurich Policy

5     Zurich argues that much like with multiple occurrences, a condition precedent of coverage

6 under the 2012-2013 Zurich policy was the insured's payment of the self insured retention for that

7 policy.  Zurich solely challenges the claim for equitable subrogation on this basis.  "The right of

8 subrogation is purely derivative."  *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App.

9 4th 1279, 1292 (1998).  As a result, "[t]he subrogated insurer is . . . subject to the same defenses

10 assertable against the insured . . . [and] cannot acquire by subrogation anything to which the

11 insured has no rights."  *Id.*

12     As noted in the prior section, a self insured retention constitutes "the insured's initial

13 responsibility and must be satisfied before there is any coverage" under a policy.  *Forecast*, 181

14 Cal. App. 4th at 1474.  The Court notes that, just as with the discussion of the self insured

15 retention with respect to multiple occurrences, Zurich's cross-claims against Brady may require

16 Brady to pay an additional self insured retention.  This alone makes a grant of summary judgment

17 based on the self insured retention improper.

18     Additionally, the Court notes that Brady's failure to pay an additional self insured retention

19 would not prevent additional liability for Zurich if the 2012-2013 Zurich policy is found to apply.

20 The Court reaches this conclusion by drawing a distinction between liability for payments from

21 the 2012-2013 Zurich policy, and the 2012-2013 Zurich policy's effect on the aggregate limit of

22 all Zurich policies that apply to Brady's loss.  The instant case is a "continuous injury" case where

23 the covered injury occurred from at least 2005 until 2013, and thus triggered all of the policies

24 during that time span.  *See Montrose II*, 10 Cal. 4th at 689 ("[B]odily injury and property damage

25 which is continuous or progressively deteriorating through several policy periods is potentially

26 covered by *all* policies in effect during those periods.").  While normally all the policy limits of

27 those policies would aggregate to make one large "uber-policy," the antistacking provision in each

28

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

of these policies provides that:

> If this Coverage Form and any other Coverage Form or policy issued to you by us or any company affiliated with us apply to the same "occurrence," the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy and only that limit shall apply to that occurrence.

ECF No. 140-6 at 545, 2012-2013 Zurich Policy.

Under this antistacking provision, the parties agree that if the 2012-2013 Zurich policy "appl[ies] to the same occurrence" as do other Zurich policies from 2006 to 2012, the aggregate limit increases from $1 million (the policy limits for all the policies from 2006 to 2012), to $2 million (the policy limit in the 2012-2013 Zurich policy).

Zurich argues, however, that the 2012-2013 Zurich policy does not "apply to the same occurrence" as the other Zurich policies from 2006 to 2012 because Brady did not pay an additional self insured retention. Zurich relies on the 2012-2013 Zurich policy's self insured retention provision, which states that "it is a condition precedent to our liability that you make actual payment of 'self insured retention' and 'defense costs' for each 'incident', until you have paid 'self insured retention' and 'defense costs' equal to the [total self insured retention]." ECF No. 140-6 at 517, 2012-2013 Zurich Policy.

However, Zurich's argument ignores the different language of the self insured retention provision and the antistacking provision. Under the self insured retention provision, a "condition precedent" of Zurich's liability on the 2012-2013 Zurich policy is the payment of the self insured retention. However, the antistacking provision states that the aggregate limit of liability will be the highest limit of liability of all those policies that "apply to the same occurrence." Therefore, the aggregate limit of liability will only increase to the level of the 2012-2013 Zurich policy if Brady's failure to pay an additional self insured retention means that the 2012-2013 Zurich policy no longer "appl[ies] to the same occurrence" as the other Zurich policies from 2006 to 2012.

To answer this question, the Court looks to the meaning of a policy "applying" to an occurrence. The Zurich policies do not define the term "apply." However, the term is used throughout the Zurich policies to indicate subject matter that falls within the scope and outside the

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1   scope of the Zurich policies, rather than whether the insurance company is actually liable for

2   payments.  For example, the Zurich policies state that "[t]his insurance applies to . . . 'property

3   damage' only if: (1) The . . . 'property damage' is caused by an 'occurrence.'"  ECF No. 140-6 at

4   524, 2012-2013 Zurich Policy.  Moreover, language concerning the self insured retention refers to

5   the "application" of coverage and the payment of the self insured retention as distinct from one

6   another.  *See id.* at 519 ("[I]t is a condition precedent to our liability for payment of these covered

7   damages that you first shall pay all applicable 'self insured retention' of each policy *for which*

8   *coverage applies*."  (emphasis added)).  Thus, there is at least an ambiguity as to whether the

9   2012-2013 Zurich policy "appl[ies] to the same occurrence" as the other Zurich policies from

10  2006 to 2012 where a "condition precedent of [Zurich's] liability" like Brady's payment of the self

11  insured retention has not been satisfied.

12          California law provides that when an ambiguity in a contract exists, the provision should

13  be "interpreted most strongly against the party who caused the uncertainty to exist."  Cal. Civ.

14  Code § 1654.  Moreover, in the context of insurance policies, "'any ambiguous terms are resolved

15  in the insureds' favor, consistent with the insureds' reasonable expectations.'"  *E.M.M.I. Inc. v.*

16  *Zurich Am. Ins. Co.*, 32 Cal. 4th 465, 471 (2004) (quoting *Safeco Ins. Co. v. Robert S.* 26 Cal. 4th

17  758 (2001)).  Here, as noted above, it is ambiguous whether the 2012-2013 Zurich policy

18  "appl[ies] to the same occurrence" as the other Zurich policies from 2006 to 2012 where a

19  "condition precedent of [Zurich's] liability" like Brady's payment of an additional self insured

20  retention has not been satisfied.  The Court, therefore, must resolve the ambiguity against the

21  drafter, Zurich, and in favor of the insured, Brady.

22          As noted above, the antistacking provision in the Zurich policies states that when multiple

23  Zurich policies "apply to the same 'occurrence,' the maximum Limit of Insurance under all the

24  Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any

25  one Coverage Form or policy."  ECF No. 140-6 at 545, 2012-2013 Zurich Policy.  Thus, if the

26  2012-2013 Zurich policy can be considered to "apply to the same occurrence" as the other Zurich

27  policies from 2006 to 2012 even if "a condition precedent of [Zurich's] liability" has not been

28  
50

satisfied, the aggregate policy limits for the Zurich policies from 2006 to 2012 would increase from $1 million (the aggregate limit of the 2006 to 2012 Zurich policies alone) to $2 million (the 2012-2013 Zurich policy limit).  Such a result is in favor of the insured because it would increase Brady's primary coverage under the Zurich policies from 2006 to 2012 without the necessity of paying the 2012-2013 Zurich policy's self insured retention.  Therefore, under the principles of construction of California law that requires the Court to resolve ambiguities against the drafter and in favor the insured, the Court finds that the 2012-2013 Zurich policy can "apply to the same occurrence" as the other Zurich policies from 2006 to 2012 even where Brady failed to satisfy a "condition precedent of [Zurich's] liability" under the 2012-2013 Zurich policy, namely, the payment of the 2012-2013 Zurich policy's self insured retention.

Accordingly, Zurich's arguments concerning the self insured retention provision does not warrant summary judgment on Penn's counterclaims.

### b.     Zurich's "Election" of the 2006-2007 Zurich Policy

Zurich argues that Brady "elected" the 2006-2007 Zurich policy to provide coverage and defense, and therefore Penn is prevented from switching to a different Zurich policy.  As in the section immediately prior to this one, Zurich only challenges Penn's counterclaim for equitable subrogation (counterclaim 3) on this theory.  Zurich argues that because Brady elected coverage under the 2006-2007 Zurich policy, Brady has waived any right to seek coverage under the 2012-2013 Zurich policy, and that as a result, Penn is subject to the same waiver defense.

However, as noted above, the Zurich policies' antistacking provision states that when multiple policies cover a loss, the "the maximum Limit of Insurance under all the Coverage Forms or policies shall not exceed the highest applicable Limit of Insurance under any one Coverage Form or policy and only that limit shall apply to that occurrence."  ECF No. 140-6 at 545, 2012-2013 Zurich Policy.  If the 2012-2013 Zurich policy provided coverage, the "highest applicable Limit of Insurance" would increase to $2 million, but that $2 million amount would not necessarily have to be paid out of the 2012-2013 Zurich policy alone, but could have been split between any number of the policies that provide coverage.  *See Montrose II*, 10 Cal. 4th at 689

51

Case No. 15-CV-02744-LHK
ORDER RE: MOTIONS FOR SUMMARY JUDGMENT

1    (noting that all policies during the course of a continuing injury are liable).  Thus, even if Brady

2    "elected" the 2006-2007 Zurich policy, which has a $1 million limit, once the aggregate limit

3    increased to $2 million, Zurich could make payment for the remaining $1 million from any of the

4    other applicable Zurich policies.  The fact that Brady "elected" one policy would not matter

5    because payment could be made from both the 2006-2007 Zurich policy that was elected and a

6    later policy as well.

7         Regardless, the evidence produced by Zurich does not establish that Brady "elected"

8    coverage under the 2006-2007 Zurich policy.  In an April 23, 2015 email from a Brady

9    representative to Zurich representatives, Brady stated that, as between the 2006-2007 Zurich

10   policy and the 2008-2009 Zurich policy, Brady noted that "Brady does not intend to ask Zurich to

11   move the loss into a later policy."  ECF No. 138-18.  Also in requests for admission, Brady admits

12   that "it elected that Zurich pay only under the 2006-2007 [Zurich] policy."  ECF No. 138-21.

13   However, in a request for admission, Brady was asked "admit that you did not elect any single

14   primary policy to provide coverage in relation to the underlying lawsuit."  ECF No. 140-5 at 163.

15   Brady responded, "Admitted."  *Id.*  Moreover, Brady's representative indicated that it did not

16   "select[] one [policy] versus another," but simply "tendered it to the earliest coverage that we

17   knew would have applied to the case," which in this case was St. Paul.  *Id.*  Accordingly, there is

18   conflicting evidence in the record and thus a triable issue of material fact.  The Court, therefore,

19   cannot grant Zurich's Motion because of Brady's "election" of the 2006-2007 Zurich policy.

20                    **c.       Zurich Policy as a Specific Excess Policy**

21        Zurich argues that Penn's counterclaims also fail because even if Zurich were to pay $2

22   million, Penn would still be liable for $1 million.  The Court cannot conclude at this stage of the

23   litigation that Zurich is correct.  Brady and Devcon settled the underlying litigation for $4 million.

24   Travelers, Penn, Zurich, and Everest each paid $1 million.  However, Everest is not a party to this

25   suit and neither party has provided the Everest policy language to the Court.  Therefore, the Court

26   cannot conclude that Zurich would definitively need to pay before or after Everest.

27        Moreover, as to Travelers' Motion, the Court found a triable issue of material fact as to

28                                                    52

United States District Court
Northern District of California

United States District Court
Northern District of California

whether there were one or two occurrences with respect to Travelers, and in the Penn Motion, the Court found a triable issue of fact as to whether the 2012-2013 Zurich policy applies.  The amount of liability that Penn owes will depend on the liability of the other insurers in this case.  Because that has not been definitively established, Zurich cannot establish that Penn would have to pay $1 million regardless.

Accordingly, the Court DENIES Zurich's Motion on Penn's first, third, and fifth counterclaims on their theories challenging liability under the 2012-2013 Zurich policy.

### D.      St. Paul's Motion

Penn's first, third, and fifth counterclaims for declaratory judgment, equitable subrogation, and unjust enrichment assert that St. Paul owes reimbursement to Penn because St. Paul did not pay into the settlement at all.  Penn's second, fourth, and sixth counterclaims for declaratory judgment, equitable subrogation, and unjust enrichment assert that St. Paul owes attorney's fees.

St. Paul argues that summary judgment is warranted because there is no evidence in the record that shows that any of the damage at issue in the case occurred during the St. Paul coverage period, June 1, 2004 to June 1, 2005.  St. Paul also argues that this precludes payments under the costs provision in the St. Paul policy.  The Court addresses each argument in turn.

### 1.      Damages During the St. Paul Policy Period

St. Paul argues that there was no coverage during its policy period and that Penn cannot produce evidence that shows that there is coverage.  The St. Paul policy differs from the Travelers and Zurich policies.  The insuring provision provides that St. Paul will "pay amounts any protected person is legally required to pay as damages for covered . . . property damage that: [¶] happens while this agreement is in effect; and [¶] is caused by an event."  ECF No. 38-1 ("St. Paul Policy") at 23.

The St. Paul policy then defines "property damage" to mean "[p]hysical damage to tangible property of others, including all resulting loss of use of that property.  We'll consider all physical damage to tangible property of others to happen at the time that it is first manifested."  *Id.* at 61.  In turn, the policy states that "[f]irst manifested means first known, or first in a condition

53

United States District Court
Northern District of California

1    where it reasonably should have been known, by [Brady]." *Id.* at 60.

2         The "first manifested" trigger for policy coverage differs from the "occurrence" trigger

3    found in the Travelers and Zurich policies.  Rather than a policy being triggered by the occurrence

4    of damage during a policy period, policy coverage is triggered where the "property damage"

5    becomes manifest.  *See Korossy v. Sunrise Homes, Inc.*, 653 So. 2d 1215, 1226 (La. 1995) (under

6    a manifestation trigger "the effects of the excessive settlement did not become 'damage' until it

7    was discovered.").

8         In the St. Paul Motion, St. Paul argues that Penn cannot produce any evidence that any

9    damage "first manifested" in the period between June 1, 2004 and June 1, 2005.  In response, Penn

10   points to a single piece of evidence, the declaration of Thomas Butt.  As discussed in the context

11   of the Travelers Motion above, the Thomas Butt declaration states that "the water damage that was

12   caused by, among other things, the flaws in Therma's work in the installation of the showers and

13   tubs began to take place within no more than six months after the showers and tubs were first put

14   to use in October 2004."  ECF No. 140-5 at 128.  This declaration provides evidence that water

15   damage started occurring during the St. Paul policy period.  However, this declaration provides no

16   evidence that Brady knew or had any reason to know that such water damage was occurring at that

17   time.

18        This lack of evidence is confirmed by Penn's response to St. Paul's interrogatories.  In

19   interrogatories served on Penn, St. Paul asked "For each occurrence YOU contend implicates

20   additional coverage under [the Travelers and St. Paul] POLICIES, state: (a) when YOU contend

21   physical damage to tangible property at the PROJECT reasonably should have been known to

22   anyone . . . ."  ECF No. 132-4 at 11–12.  In response, Penn states that "with respect to interior

23   defects: [¶] For Brady, by early 2012" and "[w]ith respect to exterior defects: [¶] For Brady, by

24   December 2012." *Id.* at 12.  Penn argues that its statement "by early 2012" actually meant "by

25   least 2012," and thus is not an admission.  Even if Penn is correct, Penn has still failed to satisfy

26   its burden of providing any evidence that Brady had any reason to know of water damage during

27   the St. Paul policy period.

28
                                                    54

### 2. Costs Provision

St. Paul argues that, because there is no coverage under the St. Paul policy, St. Paul also cannot be held liable for attorney's fees under its "Additional Payments" provision. The Court notes that this provision differs from the Travelers and Zurich policies' "Supplementary Payments" provisions. The St. Paul Additional Payments provision states that St. Paul will "pay all costs taxed against any protected person for *covered* injury or damage or employee benefits loss in a suit." St. Paul Policy at 26 (emphasis added). As noted in the prior section, Penn has failed to create a triable issue of material fact with respect to there being coverage in this case. Therefore, no costs can be taxed here.

Accordingly, the Court GRANTS St. Paul's Motion for Summary Judgment in its entirety.

## IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:

- **Penn's Motion:** The Court GRANTS Penn's Motion as to Brady, but DENIES Penn's Motion as to Zurich and American Guarantee.
- **Travelers' Motion:** The Court GRANTS Travelers' Motion as to Penn's claims for attorney's fees, but DENIES Travelers' Motion as to Penn's other claims.
- **Zurich's Motion:** The Court GRANTS Zurich's Motion as to Penn's claims for attorney's fees, but DENIES Zurich's Motion as to Penn's other claims.
- **St. Paul's Motion:** The Court GRANTS St. Paul's Motion in its entirety.

**IT IS SO ORDERED.**

Dated: March 7, 2017

*Lucy H. Koh*

LUCY H. KOH
United States District Judge